IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANIELLE McCOY, et al. : : :

v.                  :   Civil Action No. DKC 19-2137

                          :

TRANSDEV SERVICES, INC.      :

                          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this wage dispute case are (1) the motion for partial summary judgment filed by Plaintiffs Danielle McCoy, Monica Jones, Connie Jones, Sa'Quan Miller, Tyree Miles, Jawhann Price, Ayanna Bluiett, Christina Collins, Jasmine Goodman, Damon Massie, Jr., Teresa Miles, and Tyikiava White (ECF No. 142)[1], (2) the cross-motion for summary judgment filed by defendant Transdev Services, Inc. ("Transdev") against all thirteen Plaintiffs (ECF No. 172), and (3) the motion to strike affirmative defenses filed by Plaintiffs (ECF No. 175). An earlier discovery and sanction motion will also be resolved (ECF No. 110). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For

---

[1] Plaintiffs' motion only addresses the claims brought by the twelve Plaintiffs who were drivers, and thus excludes Plaintiff Deandre Banks. Transdev's cross motion, however, is against the claims of all thirteen Plaintiffs. Plaintiffs also filed a motion to seal certain exhibits (ECF No. 143). That motion will be granted. The exhibits contain personal medical information, social security numbers, other protected information that should remain sealed, and otherwise immaterial information.

the following reasons, all motions will be granted in part and denied in part.

## I.   Factual Background

Unless otherwise noted, the following facts are undisputed. During the timeframe in which the events of this case occurred, 2011-2018, Transdev Services, Inc. ("Transdev") provided transportation services in the Baltimore region under two contracts.   One was with the Baltimore City Health Department ("BCHD") and the second was with the Maryland Transit Authority ("MTA").   (ECF Nos. 142-5, at 4; 142-25, at 12; 142-2, at 30; 142-26, at 9).

Under the BCHD Contract, Transdev provided non-emergency medical transportation within Baltimore City.  (ECF No. 142-5, at 4).   The BCHD Contract was in effect from 2005 to 2018.   (*Id.*; ECF No. 142-25, at 12).   Under the MTA Contract, Transdev provided paratransit services within the Baltimore region.   (ECF No. 142-2, at 30).   The MTA Contract was in effect from 2012 to 2019.   (ECF No. 142-26, at 9-10).

Transdev subcontracted with Davi Transportation Services LLC ("Davi") to help it service the BCHD and MTA Contracts with Davi's drivers.   (ECF Nos. 142-4; 142-7; 142-26, at 11, 25).

In addition to the subcontracts with Transdev, Davi had a contract with Harford County to provide transportation services

and advertised a public transportation service on its website.[2] (*See, e.g.*, ECF Nos. 142-11, at 36-37; 181-1, at 11). Under this public transportation service, Davi's owner, James Davis, occasionally drove people who needed a ride to Maryland Correctional Facilities. (ECF No. 181-1, 14). Those trips stopped in 2011. (*Id.*, at 18-19).

Davi directly employed the twelve driver Plaintiffs who have moved for partial summary judgment ("Plaintiff Drivers"). (ECF Nos. 173-15, at 7; 173-18, at 4; 173-40, at 7; 173-41, at 7; 173-42, at 7; 173-22, at 6; 173-20, at 9; 173-21, at 14-15; 173-14, at 7; 173-17, at 5; 173-19, at 11; 173-45). Plaintiffs Danielle McCoy, Monica Jones, and Tyree Miles drove under both the BCHD and MTA Subcontracts. (*See* ECF No. 142-47 (Plaintiffs' chart providing record citations for what contracts Plaintiff Drivers drove under)). Plaintiffs Connie Jones, Jasmine Goodman, and Tyiakiava White drove under the BCHD Subcontract, but not the MTA Contract. (*Id.*). Plaintiffs Sa'Quan Miller, Ayana Bluiett, Christina Collins, Damon Massie, Jr., and Teresa Miles drove under the MTA Contract, but not the BCHD Contract. (*Id.*). The parties dispute whether Plaintiff Jawhann Price drove under the MTA Contract when

---

[2] Only four of Plaintiff Drivers drove under the Harford County Contract, and only two did so with regularity. (ECF Nos. 142-10, at 7 (Plaintiff Goodman only driving for "four days"); 142-17, at 10 (Plaintiff White driving only "once or twice"); 142-11, at 36-37 (Plaintiff Connie Jones driving two or three days per week); 142-16, at 18 (Plaintiff Price driving "on Saturdays")).

he was directly employed by Davi.  (ECF Nos. 181, at 36; 172-1, at 20).  The parties do not dispute that Plaintiff Price drove under the BCHD Contract.  (ECF No. 142-16, at 5).

### A.  The Contracts

The BCHD Contract required that Transdev comply with the Baltimore City Living Wage Ordinance ("BCLWO"), that Transdev coordinate and dispatch drivers from a central location, and that drivers wait for five minutes after knocking on a passenger's door before leaving.  (ECF No. 142-5, at 11, 13, 23).

The MTA Contract required that drivers obtained through subcontractors be "fully incorporated into [Transdev's] operation as if they were a [Transdev driver]," that drivers not "pull out from different locations or report to other starters or managers," and that Transdev be responsible for training all drivers and then use its own performance evaluation and discipline plan to evaluate drivers.  (ECF No. 142-2, at 36, 47-49).  The Contract also required Transdev to provide dispatchers to manage drivers.  (ECF No. 142-2, at 34, 42).

### 1.  The Subcontracts Between Transdev and Davi

The BCHD Subcontract was in effect from 2011 to 2018.  (ECF Nos. 142-7, at 3, 142-25, at 56).  Under the BCHD Subcontract, Davi had to adhere to the scope of service, the conditions under which those services are to be provided, and the requirements as specified in the BCHD Contract between Transdev and BCHD.  (ECF

4

No. 142-7, at 4).  Davi also had to comply with the BCLWO.  (*Id.* at 5).  Davi's drivers had to be approved by Transdev and they had to follow all Operator/Driver Qualifications stated in Transdev's "Safety Policy & Procedure Manual."  (*Id.* at 16-17).  Transdev, meanwhile, had the power to direct transportation services and the right to require Davi, "with or without cause, to remove any driver or other employee assigned to any work under this agreement."  (*Id.* at 4).

The MTA Subcontract was in effect from 2016 to 2018.  (ECF Nos. 142-4, at 2, 142-26, at 35).  Under the MTA Subcontract, Davi had to "perform all trip assignments (manifests) provided to [Davi] in a safe, timely and professional manner, consistent with all of the terms and conditions set forth in this Agreement and the Contract with [MTA]."  (ECF No. 142-4, at 7).  Davi also had to comply with the Maryland Living Wage Law ("MLWL"), (*Id.* at 9), and deliver transportation services as directed by Transdev.  (*Id.* at 7).  Davi's drivers were required to comply with Transdev's driver standards and to be "incorporated into Transdev's overall operation as if they were a Transdev Operator."  (*Id.* at 8). Transdev's obligations included monitoring the performance of Davi drivers and maintaining records of their performance using Transdev's own employee performance, evaluation, and discipline plan.  (*Id.* at 10).  Transdev reserved the rights to reject any driver for hire if he or she did not meet Transdev's minimum

requirements and to "require" Davi to "remove [a driver] from service on this contract for any reason[.]" (*Id.* at 10).

### 2.   Training

Transdev required Davi's drivers be trained before they could work under either Subcontract.  (ECF Nos. 142-7, at 4; 142-4, at 15-16).  Under the BCHD Subcontract, Davi trained drivers but had to obtain Transdev's approval of the training program before it could be administered.  (ECF Nos. 142-7, at 4, 16; 142-25, at 31-32).  Under the MTA Subcontract, Transdev trained the Davi drivers. (ECF No. 142-4, at 41-42).

Transdev's MTA training program had to be approved by the MTA, was required to include a set list of training topics, was required to be a minimum of 110 hours, and was required to have a minimum of 40 hours of behind the wheel training.  (ECF No. 142-2, at 47-49).  Transdev, however, developed a 120-hour training program split into three one-week sections.  (ECF No. 142-26, at 42).  Week one was classroom training, week two was closed driving course training, and week three was driving under an adjunct trainer's supervision.  (*Id.*).  As part of the classroom training, trainees took quizzes.  (ECF No. 142-27, at 10).  There was also a final test.  (ECF No. 142-26, at 42).  A trainee's failure to pass the final test, or failure to pass too many of the smaller quizzes, resulted in Transdev removing the trainee from the training and prohibiting him or her from driving under the MTA

Contract.  (ECF Nos. 142-24, at 15, 19; 142-26, at 42).  Failure to pass one of the smaller quizzes, however, did not result in automatic removal from the training.  (ECF No. 142-26, at 42).  Trainers would usually give trainees another chance to pass the quiz.  (ECF Nos. 142-26, at 42; 142-24, at 19).

Davi's direct employees, including Plaintiff Drivers, attended the entirety of the training program just like Transdev's direct employees.  (ECF Nos. 142-27, at 9; 173-14, at 16, 17; 142-13, at 52-53).  Trainees were sometimes separated in the classroom by who their direct employer was so that paperwork could be distributed and collected.  (ECF No. 173-14, at 16).  Transdev's employees received some additional trainings on union-topics because they were members of a union.  (ECF No. 142-26, at 54).

Although Transdev provided the training, Davi direct employees filled out a Davi attendance form while at the training. (ECF Nos. 173-17, at 10; 173-32, at 26).  Deandre Banks, the Davi supervisor stationed at the Transdev facility, was responsible for the attendance forms and submitted them to Davi at the end of the week.  (ECF No. 173-32, at 19).

### 3.  The Workday for Plaintiff Drivers

Plaintiff Drivers completed pre- and post-trip inspections. (*See e.g.*, ECF Nos. 173-18, at 49-50, 80; 173-14, at 10; 142-11, at 13).  BCHD drivers completed their pre-inspection reports using a form which was attached to the manifest that Transdev faxed to

7

the Davi facility.  (ECF No. 173-18, at 33-34).  If, as sometimes occurred, Transdev had not faxed the manifest-inspection form "package" to Davi in time for the start of the inspection, then the driver would leave the Davi facility, drive to the Transdev facility, obtain both the manifest and inspection form, and then begin his or her route from the Transdev facility.  (*Id.*).

The MTA Subcontract required drivers to conduct a daily pre-trip and post-trip inspection "specified by Transdev and documented on a specified form."  (ECF No. 142-4, at 13).  The driver could not leave Transdev's facility and start his or her run until the driver had completed and submitted the inspection form.  (*Id.*).  The MTA Contract required inspections and required they be completed on an MTA provided form.  (ECF No. 142-2, at 53).  Plaintiff Drivers on the MTA Subcontract also clocked in and out using Transdev's system.  (ECF Nos. 142-26, at 46; 173-18, at 49-50).

Plaintiff Drivers completed their drives according to manifests, or daily schedules for the people the driver was to pick up and drop off during a predetermined time frame.  (ECF Nos. 142-26, at 38; 142-25, at 19).  The manifests were produced in different ways depending on the contract.  BCHD Contract manifests were prepared by Transdev using a computer system called Trapeze.  (ECF No. 142-25, at 30).  The BCHD sent Transdev what passengers needed to be picked up and at what time.  (*Id.* at 19).  Davi sent

Transdev which of its drivers and vehicles were available and the times at which they were available. (*Id.* at 20). Transdev put those two sets of information into the Trapeze system, which produced the manifest. (*Id.* at 20, 30-31). Transdev then sent the manifests to Davi the night before they were to be driven so that Plaintiff Drivers could pick up their manifests the mornings of their drives. (ECF Nos. 142-25, at 20; 173-20, at 13).

MTA Contract manifests were created and sent by the MTA to Transdev through the Trapeze system. (ECF Nos. 142-26, at 20, 38). Transdev selected a group of run assignments and sent them to Davi, who assigned drivers to the runs. (*Id.* at 21-22). Plaintiff Drivers obtained the manifest for their run from Transdev's office on the morning of their run. (*Id.* at 38-39).

Transdev provided all drivers with dispatchers and dispatch services. Plaintiff Drivers could not amend their manifest, or do their pickups out of order, without approval from a dispatcher. (ECF Nos. 142-26, at 17-18, 39; 142-4, at 8; 142-7, at 4). Transdev's dispatchers, however, could amend manifests through making an "add-on"—removing a passenger assignment from one driver's manifest and putting it on another's. (ECF No. 142-26, at 18). Transdev dispatchers made these changes "pretty often"— as much as once per manifest. (*Id.*). When deciding to modify a manifest, Transdev dispatchers treated all drivers the same. (*Id.*; ECF No. 142-25, at 36-37). If a passenger was a no-show, then

9

BCHD Contract drivers were required by the BCHD Contract to wait five minutes before leaving. (ECF No. 142-5, at 13). MTA Contract drivers had to obtain dispatcher permission before leaving the no-show. (ECF No. 142-26, at 17-18, 46).

If an accident occurred, no matter how minor (such as brushing a mirror), both Subcontracts required drivers to make an immediate report to Transdev's dispatchers. (ECF Nos. 142-7, at 6; 142-4, at 14-15). The Subcontracts also required drivers to submit written accident reports to Transdev. (*Id.*). The BCHD Subcontract also required Davi to develop an "Accident Policy and Procedure," which had to include a specified series of procedures. (ECF No. 142-7, at 5). The "Accident Policy and Procedure" had to be approved by Transdev. (*Id.*). The MTA Subcontract's requirements were based on the MTA's requirements for all of Transdev's drivers. (ECF No. 142-2, at 57-58). The MTA Contract also required Transdev to provide enough "Road Supervisors" so that every thirty runs had a dedicated Road Supervisor. (*Id.* at 42). Road Supervisors' primary duties were to respond to accidents and observe drivers on the road. (*Id.*; ECF No. 142-25, at 11; 142-26, at 13).

Plaintiff Drivers did their drives on vehicles provided by either Davi or Transdev. BCHD Contract runs were done on vehicles owned by Davi. (*See, e.g.*, ECF No. 142-16, at 6). Under the MTA Subcontract, Plaintiff Drivers were assigned vehicles to use by Transdev. (ECF No. 142-26, at 26-27). Transdev did not own the

vehicles but had leased the vehicles from the MTA, as required by the MTA Contract.  (*Id.*; ECF No. 142-2, at 46).  Transdev, however, was responsible for installing surveillance cameras on the vehicles, maintaining the vehicles, and fueling the vehicles, although MTA would reimburse Transdev's fuel costs.  (ECF Nos. 142-2, at 46, 60-61; 142-26, at 26-27).

### 4.   Deandre Banks

Plaintiff Deandre Banks was employed by Davi.  (ECF No. 173-32, at 8, 11).  He worked first at Davi's facility and then at Transdev's.  (*Id.* at 11, 17-18).  While working at Transdev's facility, he supervised Davi's drivers as a dispatcher and road supervisor, working on both the BCHD and MTA contracts.  (*Id.* at 9, 16, 24).  He interacted with Davi's drivers throughout their days in his position as a dispatcher and road supervisor, had a Davi employed supervisor, and also followed instructions from Transdev employees.  (*Id.* at 10, 11-13; ECF No. 181-3, at 14-17, 20-21, 39-40).  While working at Transdev's facility, he was around Transdev's direct employees and believes they were aware of when he was in the office, but he did not sign in or out with them when his day started or ended.  (*Id.* at 31-34).

## II.  Cross Motions for Summary Judgment

### A.   Summary Judgment Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any

material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."   *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."   *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).   The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.   *See Liberty Lobby*, 477 U.S. at 252.

12

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal citation omitted). In doing so, it must "take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (internal citation omitted).

**B.  The Parties' Motions for Partial Summary Judgment**

Plaintiff Drivers move for partial summary judgment on nine issues:

> (1) Defendant Transdev Services, Inc. ("Defendant") jointly employed Plaintiffs under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401, et seq., and Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, et seq.;

13

(2) Plaintiffs were employees, not independent contractors, under the FLSA, MWHL, and MWPCL;

(3) Plaintiffs were paid wages falling below those required by the minimum and overtime wage provisions of the FLSA and MWHL;

(4) The three-year statute of limitations for the FLSA applies;

(5) Plaintiffs are entitled to liquidated damages under the FLSA and MWHL;

(6) Plaintiffs were denied wages in violation of the MWPCL;

(7) Plaintiffs who worked under Defendant's MTA Contract were paid wages falling below those required by the Maryland Living Wage Law ("MLWL"), constituting a violation of both the Maryland Living Wage Law and the MWPCL, which Plaintiffs may enforce through both statutes;

(8) Plaintiffs who worked under Defendant's BCHD contract were paid wages falling below those required by BCLWO, constituting a violation of the MWPCL that Plaintiffs may enforce through the MWPCL; and

(9) Plaintiffs are third-party beneficiaries of Defendant's contracts with MTA and BCHD, and Defendant is liable to them for breaching those contracts.

(ECF Nos. 142; 142-1).

Defendant cross moves for partial summary judgment on five issues:

(1) Transdev did not jointly employ Plaintiffs under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et. seq., the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §3-401, et seq., the Maryland Wage Payment and Collection Law

14

("MWPCL"), the Maryland Living Wage Law ("MLWL"), Md. Code Ann., State Fin. & Proc. §18-101 et seq.;

(2) Plaintiffs Monica Jones and Deandre Banks are precluded from coverage under the MWHL;

(3) Transdev is not liable under the MLWL;

(4) Plaintiffs Danielle McCoy, Tyree Miles, Ayana Bluiett, Christina Collins, Damon Massie, Jr., Teresa Miles, and Jawhann Price are precluded from coverage under the MLWL; and

(5) Plaintiffs are not intended beneficiaries under the MTA and BCHD Contracts.

(ECF Nos. 172; 172-1).

The FLSA, MWHL, and MWPCL ensure that employees are paid enough and properly for their work. The FLSA and the MWHL require employers to pay their employees a minimum hourly wage and an overtime rate when employees work more than 40 hours in a week. 29 U.S.C. §§ 206(a)(1); 207(a)(1); Md. Code Ann., Lab. & Empl. §§ 3-413; 3-415. The MWPCL requires employers to pay their employees what they are owed regularly and in full on departure. Md. Code Ann., Lab. & Empl. §§ 3-502(a)(1); 3-505(a). "Read together, [the MWHL and MWPCL] allow employees to recover unlawfully withheld wages from their employer, and provide an employee two avenues to do so." *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 653 (2014) (citation omitted). "Claims under the FLSA and the MWHL can be analyzed together. This is because [t]he requirements under the MWHL mirror those of the federal law.'" *Gaither v. Davi*

*Transportation Services, LLC*, No. 18-cv-1447-ELH, 2020 WL 2614783, at *4 (D.Md. May 22, 2020) (quoting *Turner v. Human Genome Sciences, Inc.*, 292 F.Supp. 738, 744 (D.Md. 2003); citing *Friolo v. Frankel*, 373 Md. 501, 513 (2003)).

The MLWL "increases the applicable minimum wage for workers covered by 'State contract for services.'" *See* Md. Code Ann., State Fin. & Proc. § 18-103; *McCoy*, 2021 WL 962534, at *10. Similarly, the BCLWO requires "service workers" performing work under "service contracts" with Baltimore City be paid the City's living hourly wage rate, and to be paid overtime. Balt. City Code, Art 5, §§ 26-2; 26-5; 26-6.

### 1.   FLSA and MWHL Issues

Plaintiff Drivers contend that Transdev is liable under the FLSA and MWHL as a joint employer. For Transdev to be liable under this theory, Plaintiff Drivers must prove (1) that Davi and Transdev should be treated as joint employers, and (2) that Plaintiff Drivers were employees of the combined entity. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133, 139-40 (4th Cir. 2017) (citing 29 U.S.C §§ 203(e)(1); 206(a); 207(a)(1); *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 305-07 (4th Cir. 2006)). In "joint employment" situations, all employers "are responsible, both individually and jointly, for compliance" with the FLSA. 29 C.F.R. § 791.2(a).

Related to their FLSA and MWHL claims, Plaintiff Drivers move for summary judgment on the following issues: (1) that Transdev was a joint employer with Davi; (2) that Plaintiff Drivers were employees of Transdev; (3) that, in an unspecified amount, Plaintiff Drivers are owed unpaid minimum and overtime wages, for which Transdev is liable; (4) that the FLSA's three-year statute of limitations applies; and (5) that Plaintiff Drivers are entitled to liquidated damages under the FLSA and MWHL.

On the FLSA and MWHL claims, Transdev opposes all of Plaintiff Drivers' motions, and cross-moves for summary judgment that (1) it was not the employer of any of the thirteen Plaintiffs and (2) that Monica Jones and Deandre Banks are precluded from coverage under the MWHL.

### a. Joint Employment

In *Salinas*, the Fourth Circuit developed a six-factor test to be used when analyzing whether an alleged employer is a "joint employer" for purposes of the FLSA:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3) The degree of permanency and duration of the relationship between the putative joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141-42. The absence of any one factor, or even a majority of factors, is not dispositive as to whether a joint employment relationship exists. *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 770 (4th Cir. 2017). "[T]he fundamental question guiding the joint employment analysis is whether two or more [] entities are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 769 (internal quotations omitted).

The first factor, shared power to control, weighs in favor of finding a joint employment relationship. Transdev reserved power

to direct the transportation services and shared this with Davi. (ECF Nos. 142-7, at 4; 142-4, at 7).  Transdev also incorporated Plaintiff Drivers driving the MTA Contract entirely into its operation.  (ECF No. 142-4, at 8).  The putative joint employers shared control over training, with Transdev approving the BCHD Subcontract training and providing the MTA Subcontract training. (ECF Nos. 142-7, at 4, 16; 142-25, at 31-32; 142-4, at 41-42). Transdev exercised control on a daily basis as well, directing Plaintiff Drivers by sharing control over the manifests to which Plaintiff Drivers would be assigned, conducting dispatch services, and requiring near immediate updates on even the slightest accident.  (ECF Nos. 142-4, at 8, 14-15; 142-7, at 4, 6; 142-25, at 19, 20, 30-31, 36-37; 142-26, at 17-18, 20-22, 38-39).  Transdev argues that it is erroneous to say that it produced the manifests. (ECF No. 172-1, at 25-26).  While true that Transdev did not *solely* produce the manifests, it is undisputed that Transdev occupied a central role in their creation.  It was Transdev that combined BCHD routes with Davi drivers' schedules to produce the BCHD manifests, and in doing so exercised discretion in coordinating the routes.  And it was Transdev that selected and sent a set of MTA manifests to Davi.  Thus, Transdev did exercise control over the creation of the manifests which in turn dictated Plaintiff Drivers' workdays.

19

As to the second factor, control over hiring, firing, and the terms or conditions of employment, Transdev had power over all four.  Transdev correctly points out that all of Plaintiff Drivers were hired and directly employed by Davi, not by Transdev.  (ECF No. 172-1, at 37-38).  Despite this, it is undisputed that Transdev was still involved in Davi's hiring process by setting aside driver applications and forwarding them to Davi when Transdev knew Davi needed drivers.  (ECF Nos. 142-24, at 24, 26; 142-27, at 24; 142-39; 142-40; 142-41).  Moreover, Plaintiff Damon Massie, Jr., applied to work at Transdev as a driver, was made a contingent employment offer by Transdev, and trained as a Transdev driver.  (ECF Nos. 173-44, at 7-8; 142-13, at 48-49, 52-54).  Then Mr. Massie's contingent offer was revoked, and he was sent to be hired by Davi.  (*Id.*).  The parties dispute whether Mr. Massie was a part of that decision, but the result is undisputed.  Regarding firing, under both Subcontracts, Transdev had the power to require Davi to remove a driver from services.  (ECF Nos. 142-4, at 10; 142-7 at 4).  Transdev used this power, and its power to control Plaintiff Drivers' conditions of employment, at least once when it removed Plaintiff Sa'Quan Miller from the driving rotation after he was observed using his cell phone while driving.  (ECF No. 142-36, at 4).  Transdev's Safety Manager then emailed James Davis and told him that Mr. Miller needed to be terminated.  (*Id.* at 3).  He was subsequently terminated.  (ECF No. 173-19, at 15-16).  Lastly,

Transdev had and exercised the power to modify Plaintiff Drivers' schedules.  (ECF Nos. 142-25, at 36-37; 152-26, at 18); *Salinas*, 848 F.3d at 147 (finding defendant's dictation of plaintiffs' hours and requirement that plaintiffs work additional hours or days was evidence of authority over terms and conditions of employment); *Young v. Act Fast Delivery of West Virginia, Inc.*, No. 5:16-cv-09788, 2018 WL 279996, at *7 (S.D.W.Va. Jan 3, 2018) (modifying non-negotiable delivery schedules of Plaintiffs).[3]

As to the third factor, the degree of permanency and duration of the relationship between the putative joint employers, Davi and Transdev's relationship shows the entities were not completely disassociated.  Transdev, correctly, points out that its relationship with Davi was not an exclusive one, that Davi was an independent company with business beyond its Transdev contracts, and that Davi was not completely dependent on Transdev.  (ECF No. 172-1, at 38).  Nonetheless, the undisputed fact is that the two businesses were not completely disassociated.  Their business relationship lasted seven years.  During that time Davi asked at

---

[3] Transdev points to statements made by Plaintiffs' counsel about the control Davi exercised over the plaintiffs in a prior lawsuit against Davi and Transdev as evidence that Davi, and not Transdev, employed plaintiffs. (*See, e.g.*, ECF No. 172-1, at 20, n.60); *Gaither v. Davi Transp. Servs., LLC*, Civil Action No. 18-cv-1447-ELH, 2020 WL 2614783 (D.Md. May 22, 2020).  While insightful, such admissions by Plaintiffs' counsel that Davi exercised employer-like control over similar plaintiffs is not dispositive.  The joint employer framework, by its nature, contemplates a direct employer controlling its direct employees.

least once for help paying its expenses and payroll. (ECF No. 142-27, at 19-22, 34-35). Transdev made Davi a $30,000 loan that was never repaid, and Transdev does not know how the money was spent. (*Id.*). Moreover, for a period of time Transdev reimbursed Davi's expenses on workers' compensation insurance. (ECF Nos. 142-26, at 34; 142-27, at 18; 142-29; 142-30). Transdev, however, asserts that "at no time has Transdev ever paid Davi's workers compensation insurance, vehicle insurance, or payroll." (ECF No. 172-1 at 32). It is not clear whether Transdev intends this to be clever wordplay—denying *paying* for workers' compensation insurance, but not denying *reimbursing* Davi for workers' compensation—or if Transdev is denying both paying and reimbursing Davi.[4] The undisputed facts, however, are that Transdev, for a period of time, reimbursed Davi for workers' compensation insurance. Aside from the loan and insurance, two of Davi's three transportation contracts were with Transdev, and of the twelve Plaintiff Drivers, only four ever worked on the Harford County Contract, and only two did so with any regularity. (*See, e.g.*, ECF Nos. 142-11, at 36-37; 181-1, at 11); *see supra* note 2; *Salinas*, 848 F.3d at 147 (finding facts that "overwhelming majority

---

[4] Further compounding Transdev's unhelpfulness on this issue is the fact that none of Transdev's citations for its assertion that it never paid Davi's workers' compensation even mention workers' compensation insurance. Elsewhere the record indicates that Davi was responsible for workers' compensation insurance. (*See, e.g.*, ECF No. 142-4, at 20).

of [subcontractor's] contracts were with Commercial, and [that] Plaintiffs worked almost exclusively on [defendant's] jobsites" weighed in favor of joint employment).  This factor weighs against Transdev because of the length and closeness of its business relationship with Davi.

As to the fourth factor, there is no dispute that Transdev did not share management of Davi, nor did it directly or indirectly own Davi.

The fifth factor is control over the employees' place of work. Transdev argues that Plaintiff Drivers spent only *de minimis* time on Transdev owned or controlled premises, because BCHD Subcontract drivers only came to a Transdev facility occasionally and MTA Subcontract drivers were only on Transdev premises for a few minutes at the beginning and end of their days.  (ECF No. 172-1, at 39-40).  Such a narrowly formalistic application of the *Salinas* test, however, is at odds with the FLSA's "remedial and humanitarian purpose," and the Fourth Circuit's instruction that the FLSA be "broadly interpreted and applied to effectuate its goals."  *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (cleaned up).  Who owned or controlled the vehicles Plaintiff Drivers worked from will be considered under this factor due to the inherent nature of Plaintiff Drivers' work.[5]  *See Young*,

---

[5] The Fourth Circuit had the opportunity to address how to apply the fifth *Salinas* factor to driving-based employment in *Hall*

2018 WL 279996, at *7 (S.D.W.Va. Jan. 3, 2018) (considering that delivery drivers worked from automobiles when assessing fifth factor, but determining that plaintiffs "mainly worked from their own automobiles"). Plaintiff Drivers under the BCHD Subcontract drove vehicles provided by Davi, but their travel throughout the day was controlled by Transdev dispatchers. (*See, e.g.*, ECF No. 142-16, at 6). Plaintiff Drivers under the MTA Subcontract drove vehicles that Transdev leased from MTA and then maintained, and their travel throughout the day was controlled by Transdev dispatchers. (ECF Nos. 142-2, at 46, 60-61; 142-26, at 26-27). This factor either weighs in favor of joint employment or is neutral.

The sixth and final factor, shared control over the ordinary functions of an employer, also leans in favor of finding that a joint-employer relationship exists. Transdev was involved in providing equipment in the form of manifests for both subcontracts and vehicles for the MTA Subcontract. While Davi handled payroll and insurance for Plaintiff Drivers, Transdev, for a period of time at least, reimbursed Davi for workers' compensation insurance. Moreover, when Davi requested financial help paying for insurance and covering payroll, Transdev provided the

---

*v. DIRECTV, LLC*, 846 F.3d 757 (4th Cir. 2017). Although the Fourth Circuit found that DIRECTV and the subcontractor that was plaintiffs' direct employer were joint employers, the court did so without explicitly analyzing the fifth factor. Thus, *Hall* is helpful, but does not fully answer this question.

24

subcontractor with a $30,000 loan, albeit without knowing how the loan was used.  Transdev also provided Davi with office space and clocked in and out Plaintiff Drivers driving under the MTA Subcontract like other Transdev drivers. (ECF Nos. 142-24, at 26-27; 142-26, at 46; 173-18, at 49-50).  This factor weighs in favor of joint employment.

Lastly, a central part of Transdev's argument against joint employment is that it was a passthrough for the BCHD and MTA Contracts' requirements and that Transdev's acts of control over Plaintiff Drivers were Transdev simply enforcing the requirements of the government contracts.  In other words, Transdev was merely conducting "quality control," and such control is not indicative of joint employment. (ECF No. 172-1, at 35-36).

The Fourth Circuit addressed the difference between contractual "quality control" and joint employment in *Salinas*. 848 F.3d at 158.  In *Salinas*, supervision by the prime contractor "went beyond double-checking to verify that the task was done properly." *Salinas*, 848 F.3d at 158 (cleaned up).  Rather, the prime contractor's foreman engaged in "daily oversight" of plaintiffs' work, provided regular feedback and instruction regarding the pace and quality of work, and conducted frequent meetings to instruct plaintiffs regarding the projects that needed to be completed and the methods by which they should be completed, as well as safety protocols to follow.  Those facts constituted

"extensive supervision . . . indicative of an employment relationship, rather than an assessment of compliance with contractual quality and timeliness standards." *Id.* (cleaned up).

In arguing that it was just doing quality control for the BCHD and MTA Contracts, Transdev cites *Salinas*, two cases cited by *Salinas*, *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) and *Zheng v. Liberty Apparel Co. Inc*, 355 F.3d 61 (2d Cir. 2003), and *Jacobson v. Comcast Corp.*, 740 F.Supp.2d 683, 690 (D.Md. 2010). In *Moreau*, the Ninth Circuit held there was not a joint employment relationship, observing that there was "no indication Air France had the authority to directly 'control' any of the workers," but that Air France did specify work to be performed and "follow[ed] up to ensure adequate performance" with safety and security regulations. *Moreau*, 356 F.3d at 950-51. In *Zheng*, the Second Circuit held that the trial court had applied the wrong standards to evaluating joint employment, remanded, and provided instruction for how to assess the joint employment relationship. In doing so, the court noted that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting agreement." *Zheng*, 355 F.3d at 75 (citing *Moreau v. Air France*, 343 F.3d 1179, 1188 (2d Cir. 2003)). In *Jacobson*, the court noted that "detailed instructions and a strict quality control mechanism will not, on

26

their own, indicate an employment relationship." 740 F.Supp.2d at 690. The court then held in a pre-*Salinas* opinion that Comcast was not a joint employer because it only exercised "quality control" over the subcontractors' hiring and work, but was not responsible for "day-to-day management" of employees. *Id.* at 690-92.

This case is more similar to *Salinas* than it is to *Moreau* and *Jacobson*. While ensuring contractual standards of quality and timeliness may be insufficient to create a joint employment relationship, supervision that goes beyond "double checking to verify that the task was done properly" can support a joint employment relationship. *Salinas*, 848 F.3d at 148. The undisputed facts are that Transdev engaged in "daily oversight" of Plaintiff Drivers, providing feedback and instructions, and regularly modifying Plaintiff Drivers' manifests as they were being carried out. (ECF No. 142-26, at 18). It is true that Transdev exerted control over Plaintiff Drivers because the BCHD and MTA Contracts required it—such as requiring dispatching from a central location or requiring drivers to wait before leaving a no-show. But the undisputed facts remain that Transdev did not send Plaintiff Drivers off to do their work and then review it for completeness or correctness at the end of the day. As in *Salinas*, Transdev's supervision went beyond double-checking compliance with the government contracts. Transdev was involved in the "day-to-day

management" of Plaintiff Drivers and used discretion when directing them, rather than merely ensuring they met standards set by the government contracts. The government contracts may have required central dispatching or drivers leaving from the same location, but Transdev's modification of manifests, or choosing which manifests to assign to Plaintiff Drivers, was at its own discretion. Likewise, the government contracts may have contained hiring requirements, but it was Transdev that decided to work with Davi to help Davi hire drivers to populate its Transdev services. Moreover, Transdev demonstrated this heightened degree of supervision in the training programs. For the BCHD Contract, Transdev approved the Davi training program without any training requirements being set by the BCHD Contract. (*See, e.g.*, ECF No. 142-5). For the MTA Contract, it is undisputed that Transdev's training program was ten hours longer than that required by MTA, that Transdev required more behind the wheel hours than the MTA Contract, and that Transdev trainers had discretion to permit the retaking of failed quizzes. (ECF Nos. 142-24, at 15, 19; 142-26, at 42). That is more than merely ensuring compliance with the MTA's training requirements. Ultimately, as *Salinas* shows, it is not just a question of whether Transdev passed on requirements of government contracts and double checked that they were met. It is also a question of the degree of involvement Transdev had in the

day-to-day work of the drivers.   It is undisputed that Transdev was involved in the day-to-day work of drivers.

In sum, five, and possibly all six, factors weigh in favor of joint employment.   The purpose of the factors is to determine whether Transdev and Davi were not completely disassociated.   Even viewing the undisputed facts in the light most favorable to Transdev, there is no genuine dispute of material fact that Davi and Transdev were so closely intertwined that they were not completely disassociated for Plaintiff Drivers' employment, and were joint employers.   Plaintiff Drivers are entitled to judgment in their favor on this issue.

### b.   Employees or Independent Contractors

There are six factors to determine whether a worker constitutes an employee or independent contractor: "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." *Salinas*, 848 F.3d at 150 (4th Cir. 2017).

As to the first factor, the degree of control exercised over the way work is performed, the joint employers exercised near total

29

control over the way Plaintiff Drivers' performed work.  They trained Plaintiff Drivers and then assigned them daily manifests, required them to follow those manifests, and frequently modified those manifests.

As to the second factor, the opportunity for profit or loss depending on managerial skill, Plaintiff Drivers' job did not entail any managerial skill.  They did their manifests as assigned to them or as modified by Transdev.  Plaintiff Drivers could not "earn more by working more efficiently," nor did they control the number of customers they serviced on a given day.  *See, e.g.*, *Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F.Supp.2d 569, 580 (D.Md. 2008); *Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F.Supp.2d 667, 674 (D.Md. 2000).  Their work was "time oriented, not project oriented," which weighs in favor of employee status.  *Schultz*, 466 F.3d at 308.

The third factor, the worker's investment in equipment or employment of other workers, is in favor of employee status.  The joint employers provided the equipment needed by Plaintiff Drivers—specifically the vehicles and the manifests.  There is no dispute that Plaintiff Drivers did not employ other workers.

The fourth factor, the required degree of skill, favors employee status.  Plaintiff Drivers' work did not require specialized skill.  They were all trained by joint employers and were not required to have advanced training.  (ECF Nos. 142-4, at

8; 142-7, at 16; 142-2, at 39-41); *Guerra v. Teixeira*, No. 16-cv-0618-TDC, 2019 WL 330871, at *9 (D.Md. Jan. 25, 2019) (finding that plaintiff received all training on the job and did not need any specialized training weighed in favor of employee status).

As to the fifth factor, the permanence of the working relationship, "[t]he more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309. Plaintiff Drivers were full time employees, working five or six days a week. (*See* ECF No. 142-47 (Plaintiffs' chart providing record citations for Plaintiff testimony that they worked five to six days per week)); *Guerra*, 2019 WL 330871, at *9 (finding that plaintiff worked "nearly every single weekday" weighed in favor of employee status). They were paid twice a month. (*See e.g.*, ECF Nos. 142-12, at 85; 173-57, at 2); *Montoya*, 589 F. Supp. 2d at 581 (noting time sheets covering two-week time periods as relevant under this factor). Plaintiff Drivers left Davi of their own accord or because they were fired. (*See, e.g.*, ECF Nos. 142-12, at 11; 142-16, at 27). Plaintiff Drivers had a permanent working relationship, and this factor weighs in favor of being employees.

The sixth and final factor, the importance of employee's services to employer's business, weighs in favor of Plaintiff Drivers being employees. Joint employers' business was and is to transport passengers. Plaintiff Drivers were transporting joint employers' customers. Thus, Plaintiff Drivers were integral to

31

joint employers' business.  *See, e.g.*, *Guerra*, 2019 WL 330871, at *9 (drapery installer integral to drapery installation business); *Butler v. PP & G, Inc.*, No. 13-cv-430-WMN, 2013 WL 5964476, at *5 (D.Md. Nov. 7, 2013) (dancers integral to night club); *Montoya*, 589 F. Supp. 2d at 581 (painters integral to painting contractor); *Heath v. Perdue Farms, Inc.*, 87 F.Supp.2d 452, 459 (D.Md. 2000) (chicken catchers integral to Perdue).

There is no genuine dispute that Plaintiff Drivers were employees of the joint employers.  Plaintiff Drivers are entitled to judgment in their favor on this issue.

Transdev's cross-motion for summary judgment on the issue of joint employer status, however, was to all thirteen Plaintiffs, including Plaintiff Deandre Banks.  For Plaintiff Banks, there is a genuine dispute as to whether Davi and Transdev were his joint employers.  While Plaintiff Banks was supervised by both Davi and Transdev personnel and worked for a period of time in a Transdev-provided office, the record is disputed as to how much control Transdev had over him.  (ECF Nos. 173-32, at 10-13, 17-18; 181-3, at 14-17, 20-21, 31-34, 39-40).  Thus, there is a genuine dispute and Transdev is not entitled to judgment on this issue.  Transdev's liability to Plaintiff Deandre Banks, if any, as a joint employer will be determined at trial.

### c. Failure to Pay Minimum and Overtime Wages

The FLSA requires that employers pay employees a minimum wage of $7.25 per hour and an overtime rate for all hours worked in a week in excess of forty. 29 U.S.C. §§ 206 (a)(1); 207(a)(1). "Plaintiff [drivers] have the burden of establishing the hours [they] claim to have worked and the work [they] claim to have performed for which they were not paid." *McLaughlin v. Murphy*, 436 F.Supp.2d 732, 737 (D.Md. 2005). In order to establish a minimum wage violation, Plaintiff Drivers must show that they did not receive compensation equal to or exceeding the product of the total number of hours worked and the statutory minimum hourly rate during a given week. *See Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir. 1969).

Under *Anderson v. Mt. Clemens Pottery Co.*'s burden shifting framework, plaintiffs have the burden of presenting sufficient evidence to create a "just and reasonable inference" as to the amount and extent of work performed without just compensation. 328 U.S. 680, 686-87 (1946); *McLaughlin*, 436 F.Supp.2d at 737. Plaintiffs do not need to give exact evidence of hours worked. *McLaughlin*, 436 F.Supp.2d at 737. The burden then shifts to the defendant to rebut the plaintiff's proffer. *Id.* at 737-38. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 738 (quoting *Anderson,* 328 U.S. at 688).

33

*See also Pforr v. Food Lion Inc.*, 851 F.2d 106, 108 (4th Cir. 1988) (The FLSA "does not mandate that a plaintiff prove each hour of overtime work with unerring accuracy or certainty.").

The plaintiff must also show that the employer had knowledge, "either actual or constructive," of the overtime work. *Butler v. DirectSAT USA, LLC*, 55 F.Supp.3d 793, 803 (D. Md. 2014).

Plaintiff Drivers' proffered evidence is their declarations, interrogatory responses, and deposition testimony that asserts the approximate period of time they worked, that they worked 8.5-to-14.0-hour shifts, that shifts averaged twelve hours in length, that they typically worked five shifts per week, but some worked six shifts, and that their paychecks amounted to a rate of less than $7.00 per hour. (*See* ECF No. 142-47 (Plaintiffs drivers' chart providing record citations for hours worked and pay rate received)). In response, Transdev offers only a single paystub which it asserts shows that Plaintiff Damon Massie was paid at a rate of $13.63 per *revenue* hour and argues that Plaintiff Drivers' evidence is speculative. (ECF No. 172-1, at 50). Transdev also argues that Plaintiff Drivers' evidence does not support a "just and reasonable inference" because several of Plaintiff Drivers' were formerly married to, or stepchildren of, James Davis. Transdev argues that Mr. Davis *could* have employment records and that Plaintiff Drivers should have obtained them from Mr. Davis,

34

as he was their former relative.  (ECF No. 182, at 16).  Transdev asserts that Mr. Davis "evaded" their subpoenas.  (*Id.*).

Plaintiff Drivers' evidence supports a "just and reasonable inference" that that they worked over 40 hours per week but were not paid minimum wage or the overtime premium.  Transdev has not offered rebutting evidence.  Transdev "cannot now argue that there is a genuine issue of material fact as to the hours" Plaintiff Drivers worked.  *Schultz v. All-Fund, Inc.*, No. 06-cv-2016-JFM, 2007 WL 2333049, at *4 (D.Md. Aug. 13, 2007) (finding plaintiffs established *prima facie* case based on affidavits attesting their recollections of time worked, and that defendants had not submitted any evidence to negate that of plaintiffs).  Moreover, it is not clear why some of Plaintiffs' prior relation to Mr. Davis puts them in a better position to obtain any records he may have.

Plaintiff Drivers have also shown that Transdev was on notice. It is undisputed that Transdev was aware of the manifests Plaintiff Drivers used in completing their drives, and was in communication with Plaintiff Drivers throughout their drives.  Moreover, Plaintiff Drivers complained to Transdev about being incorrectly paid, and Transdev is precluded "from arguing that Transdev did not have knowledge that Plaintiffs complained of not being paid in accordance with applicable law." (ECF No. 163, at 1).

There is no genuine dispute that Plaintiff Drivers were not paid minimum wage and the overtime premium and partial summary

judgment will be granted to the extent that Plaintiff Drivers are entitled to minimum and overtime wages from Transdev.  The damages owed are not calculated at this point because Plaintiff Drivers have reserved for trial the calculation of total compensation and damages owed.  (ECF No. 142-1, at 45).

    **d.   Statute of Limitations for the FLSA**

The statute of limitations for FLSA claims ordinarily is two years, but three years for willful FLSA violations.  29 U.S.C. § 255(a).  A violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "The employee alleging the violation bears the burden of proving that the violation was willful." *Boyd v. SFS Commc'ns, LLC*, No. 15-cv-3068-PJM, 2021 WL 1430723, at *6 (D.Md. Apr. 15, 2021) (quoting *Desmond v. PNGI Charles Town Gaming, LLC*, 639 F.3d 351, 358 (4th Cir. 2011)).

As discussed above, it is undisputed that Davi failed to pay Plaintiff Drivers minimum wage and overtime pay as required under the FLSA, despite the complaints of Plaintiff Drivers and other Davi employees to both Transdev, who relayed those requests to Davi, and to Davi directly.  *See supra* Section II.B.3; (ECF Nos. 142-1, at 28-29 (citing instances in which Plaintiff Drivers and other Davi drivers notified Transdev of their incorrect wages, and at least one instance when Transdev notified Davi); 172-1, at 55-

56 (conceding that Transdev was notified of Davi's erroneous pay, and citing records that it notified Davi of complaints)).   Also discussed above was that Plaintiff Drivers were Davi's employees, not its independent contractors.  *See supra* Section II.B.2.  Davi's failure to pay the federal minimum wage and overtime rate, despite its knowledge of the hours worked by its drivers and the complaints of its drivers, was "a legal violation that is, at best, 'so obvious that it should be known.'" *Boyd*, 2021 WL 1430723, at *6 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (defining recklessness)).    The   willfulness   of   Davi   "equates   to   the willfulness of its joint employer" Transdev.   *Id.*   Moreover, Transdev's failure to intervene compounded the willfulness.   *Id.* ("Moreover,   CUI's   total   lack   of   oversight   compounds   the willfulness.").   Transdev's argument that it reasonably relied on its subcontracts with Davi fails here as it did in *Boyd*.  (ECF No. 172-1, at 55); *Boyd*, 2021 WL 1430723, at *6.  There is no genuine dispute that the three-year statute of limitations applies to Defendants' FLSA overtime violations.   Plaintiff Drivers are entitled to judgment on this issue.

### e.   Liquidated Damages Under the FLSA and MWHL

Plaintiff Drivers move for summary judgment that they are entitled to liquidated damages under the FLSA and MWHL.  Transdev asserts that it acted in good faith and thus the court should exercise its discretion and deny Plaintiff Drivers' motion.  (ECF

37

No. 172-1, at 57).  Plaintiff Drivers respond that (1) Transdev has waived the defense of good faith because it was not raised until after Plaintiff Drivers' partial motion for summary judgment; and (2) Transdev did not put forward evidence that it "had any honest intention to ascertain or act upon its obligations to Plaintiffs under the FLSA or MWHL."  (ECF No. 181, at 27).

29 U.S.C. § 216(b) authorizes the court to award, in addition to compensatory damages, "an additional equal amount as liquidated damages."  "The Fourth Circuit has held that a grant of liquidated damages is the 'norm' in cases in which the FLSA is violated." *Williams v. Maryland Office Relocators*, 485 F.Supp.2d 616, 620 (D.Md. 2007) (citing *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997)).  The court can deny or reduce liquidated damages if the defendant shows that the "act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260.  An employer, however, cannot take an "ostrichlike" approach to the FLSA and "simply remain blissfully ignorant of FLSA requirements." *Roy v. Cnty. of Lexington, South Carolina*, 141 F.3d 533, 549-50 (4th Cir. 1999) (quoting *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984)).  The Fourth Circuit has elsewhere interpreted "the exemption entailed by § 260 to place a plain and substantial burden upon the employer to persuade the court that the failure to obey the statute was both in good faith

and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997) (cleaned up).

Here, the only evidence Transdev cites in support of it having acted in good faith is the deposition testimony of a corporate representative.   (ECF No. 172-1, at 57).   The testimony only establishes that the representative was familiar with the existence of the BCLWO and understood that Maryland State law follows the FLSA in requiring the payment of an overtime rate. (ECF No. 173-10, at 23-25).   Even viewing this evidence in the light most favorable to Transdev, the showing falls short of Transdev's "plain and substantial burden."   Plaintiff Drivers are entitled to liquidated damages.

### 2.   MWPCL Claim for Violations of the FLSA and the MWHL

Plaintiff Drivers move for summary judgment on their claim that Transdev is liable to them under the MWPCL, and that they are thus entitled to treble damages under the MWPCL.   Plaintiff Drivers argue that Transdev's failure to pay correct wages under the FLSA and MWHL constitutes a violation of the MWPCL.   (ECF No. 142-1, at 45).   Transdev argues that it was not involved in paying Plaintiff Drivers' wages, and thus cannot be liable.   (ECF No. 172-1, 50-51 (citing *Pridgen v. Appen Butler Hill, Inc.*, No. 18-cv-61-JKB, 2019 WL 1048950, at *5 (D.Md. Mar. 5, 2019)).

Maryland applies the FLSA joint employer framework to the MWPCL. *See Campusano v. Lusitano Const. LLC*, 208 Md.App. 29, 38 (2012). Thus, it is undisputed that Transdev is a joint employer for the purposes of MWPCL liability. *See supra* Section II.B.1. It is also undisputed that Davi was responsible for paying Plaintiff Drivers' wages and failed to pay all wages correctly. Thus, Transdev shares Davi's liability for violating the MWPCL. *See Boyd*, 2021 WL 1430723, at *5 ("[Joint Employer d]efendants' failure to pay overtime wages also constitutes a violation of the MWPCL"). Plaintiff Drivers are entitled to judgment that Transdev violated the MWPCL as a joint employer.

Turning to treble damages, a plaintiff may be "entitled to recover liquidated damages under the FLSA or treble damages under the [MWPCL], but not both." *Quiroz v. Wilhelp Commercial Builders, Inc.*, No. 10-cv-2016-WGC, 2011 WL 5826677, at *3 (D.Md. Nov. 17, 2011). "Enhanced damages serve the dual purposes of compensating employees for consequential losses, such as late charges or evictions that can occur when employees who are not properly paid are unable to meet their financial obligations; and of penalizing employers who withhold wages without colorable justification." *Clancy v. Skyline Grill, LLC*, No. 12-cv-1598-ELH, 2012 WL 5409733, at *8 (D.Md. Nov. 5, 2012) (quoting *Lopez v. Lawns R Us*, No. 07-cv-2979-DKC, 2008 WL 2227353, at *4 (D.Md. May 23, 2008)).

> [I]t has become customary in this district to award double damages under the FLSA, but not

40

> treble damages under the MWPCL, when the
> "defendants '[do] not offer any evidence of a
> bona fide dispute' to make liquidated damages
> inappropriate, [but the] plaintiffs '[do] not
> offer any evidence of consequential damages
> suffered because of the underpayments.'"
> *Clancy*, 2012 WL 5409733, at *8 (quoting *Lopez*,
> 2008 WL 2227353, at *4); *see also Castillo v.
> D&P Prof'l Servs., Inc.*, No. 14-cv-1992-DKC,
> 2015 WL 4068531, at *6-7 (D.Md. July 2,
> 2015); *Labuda v. SEF Stainless Steel, Inc.*,
> No. RDB-11-1078, 2012 WL 1899417, at *3 (D.Md.
> May 23, 2012); *Monge v. Portofino Ristorante*,
> 751 F.Supp.2d 789, 800 (D.Md. 2010).

*Villatoro v. CTS & Assocs., Inc.*, No. 14-cv-1978-DKC, 2016 WL 2348003, at *3 (D.Md. May 4, 2016).

The parties first disagree as to whether there is a bona fide dispute. Transdev's arguments that there is a bona fide dispute as to whether it owes Plaintiff Drivers' wages are essentially that it is not either the direct or joint employer of Plaintiff Drivers, that it was Davi's duty to pay Plaintiff Drivers' correct wages, and that there was a bona fide dispute about whether it was a joint employer. (ECF No. 172-1, at 53). It is undisputed, however, that Transdev was Plaintiff Drivers' joint employer. Moreover, Transdev has not proffered any evidence establishing that Davi's failure to pay Plaintiff Drivers correct wages was due to a bona fide dispute regarding their entitlement to those wages.

The parties next dispute whether Plaintiff Drivers have brought forward evidence of consequential damages. Plaintiff Drivers only cite the interrogatory responses of the thirteen Plaintiffs, which asserted only the conclusion that they were owed

41

"applicable damages, including consequential damages." (*See* ECF
No. 181, at 33 n.28 (citing all thirteen interrogatory responses)).
Thus, Plaintiff Drivers have provided no evidence of any
consequential damages. Plaintiff Drivers are not entitled to
judgment as a matter of law on this issue because there is no
evidence of consequential damages.

### 3. Living Wage Law Claims

Plaintiff Drivers seek summary judgment on several issues
which all concern their alleged entitlement to the living wage
rates of the Baltimore City Living Wage Ordinance and the Maryland
Living Wage Law. They have at least three theories for how
Transdev is liable to them for violating the living wage laws: (1)
a direct action under the MLWL; (2) an action under the MWPCL,
because Transdev violated the BCLWO and the MLWL, and violating
those statutes was a violation of MWPCL; and (3) as third-party
beneficiaries under the BCHD and MTA Contracts that Transdev
breached because those Contracts require compliance with the BCLWO
and the MLWL.

Transdev opposes Plaintiff Drivers' motions and cross-moves
for summary judgment that (1) it was not an employer of the
"MTA Plaintiffs" (which it defines as Plaintiffs Danielle McCoy,
Monica Jones, Sa'Quan Miller, Tyree Miles, Jawhann Price, Ayana
Bluiett, Christina Collins, Damon Massie, and Teresa Miles (ECF

No. 172-1, at 15)) under the MLWL and (2) none of the thirteen Plaintiffs were third-party beneficiaries.

### a.  Direct Action Under the MLWL

The basis on which Plaintiff Drivers argue that Transdev is liable to them under the MLWL is not entirely clear.  Employers subject to the MLWL must pay their employees Maryland's living wage rate, but Plaintiff Drivers do not assert that the FLSA joint employer doctrine applies to the MLWL or that they are Transdev's direct employees.  Moreover, as Transdev has pointed out, no case can be found stating that the FLSA's joint employer doctrine applies to the MLWL.  (ECF No. 172-1, at 42, n.172).

Plaintiff Drivers' argument for liability seems to be that the direct employee of a subcontractor may sue the general contractor for the *subcontractor's* failure to pay MLWL compliant wages because (1) the "MLWL is structured to ensure that *all* employees under a contract are paid consistent with the MLWL"; (2) contractors have an obligation to submit their subcontractors' payroll records to the State; and (3) the cause of action provision of the MLWL does not limit who employees may sue for their erroneous wages.  (ECF No. 181, at 34-35 (emphasis in original)).

Under that theory, Plaintiff Drivers assert that it is undisputed that (1) the MTA Contract required Transdev to comply with the MLWL; (2) Transdev failed to submit payroll records to the State as required by the MLWL; (3) Plaintiff Drivers were paid

less than the MLWL's wage rate; and (4) employees may sue anyone to recover the difference between their paid and owed wages. (ECF No. 142-1, at 51-54).

The MLWL provides that an employer working under certain government contracts must pay the living wage, as set by the statute, to its employees.[6]  Md. Code Ann. Fin. & Proc. § 18-103(a).  "Employer" is defined as either a "contractor or subcontractor that has a State contract for services valued at $100,00 or more."  Md. Code Ann. Fin. & Proc. § 18-101.  "Employee" is not defined by the statute.  The MLWL creates two remedies for employees, filing a "complaint" with the Commissioner of Labor and Industry or suing for the difference between wages paid and wages owed.  Md. Code Ann. Fin. & Proc. §§ 18-107; 18-109.  The MLWL also permits the Commissioner of Labor and Industry to "adopt regulations governing employers subject to this title."  Md. Code Ann. Fin. & Proc. § 18-104(a).  One such regulation defines employee:

> (1)  "Employee" means an individual who satisfies the criteria of the employer-employee relationship test which examines:
>
> (a)  If the employer has the power to select and hire the employee;

---

[6] There is a "lack of caselaw" on the MLWL and thus the parties' arguments focus on the text of the statute.  *McCoy v. Transdev Services, Inc.*, No. 19-cv-2137-DKC, 2021 WL 962534, at *10 (D.Md. Mar. 15, 2021).

> > (b)   If the employer pays the employee wages;
> >
> > (c)   If the employer has the power to discharge the employee;
> >
> > (d)   If the employer has the power to control the employee's conduct; and
> >
> > (e)   If the work is part of the regular business of the employer.

COMAR 21.11.10.01(B).  Another regulation provides that:

> > An employer submitting payroll records pursuant to §C of this regulation shall submit a statement that is signed by the contractor that indicates the following:
> >
> > (1)   The payroll records are correct; and
> >
> > (2)   The wage rate paid is not less than that required in State Finance and Procurement Article, § 18-103, Annotated Code of Maryland.

COMAR 21.11.10.05(E).

Plaintiff Drivers' theory of liability, however, is not present in the MLWL's text.  It is true that "employer" can mean either a contractor or subcontractor, and that both are obligated to pay the living wage rate to their employees.  But no provision states that general contractors are liable to the employees of subcontractors for the subcontractor's failure to pay the living wage rate.  The cause of action provision may not state who employees may sue, but employees can only logically sue an entity that owed them a duty under the MLWL—their employer.  *See* Md. Code

45

Ann. Fin. & Proc. § 18-109 ("If an employee was paid less than the wage rate required under this title the employee is entitled to sue to recover the amount of the difference between the wage rate required under this title and the amount received by the employee.").

The only test for identifying an employer-employee relationship cited by either party is the "employer-employee relationship test" at COMAR 21.11.10.01(B). Transdev rightfully points out that at no point have Plaintiff Drivers attempted to argue that they meet the requirements of the employer-employee test.[7] (ECF No. 182, at 17). Even if they had, Plaintiff Drivers could not succeed because it is undisputed that Davi, not Transdev, paid their wages. Moreover, Plaintiff Deandre Banks does not meet the MLWL's employer-employee relationship test for the same reason. Thus, there is no genuine dispute that Transdev was not an employer of any of the thirteen Plaintiffs under the MLWL. Plaintiff Drivers are not entitled to judgment on this issue. Transdev, however, is entitled to judgment on this issue against all thirteen plaintiffs.

---

[7] Plaintiff Drivers attempt to argue that this test merely distinguishes between independent contractors and employees, and that it is inappropriate to use here. Yet, distinguishing between independent contractors and employees is also the purpose of the employee test applied above to determine FLSA and MWHL liability.

**b.    Enforcing Alleged BCLWO and MLWL Violations Through the MWPCL**

Plaintiff Drivers move for summary judgment that Transdev is liable for violating the MWPCL because Transdev violated the BCLWO and the MLWL.  As discussed above, Transdev is not liable to Plaintiff Drivers under the MLWL as a matter of law.  Thus, only the BCLWO will be discussed.

The BCLWO is like the MLWL in that it requires entities doing work under certain Baltimore City government contracts to pay their employees Baltimore City's living wage and overtime rates.  Balt. City Code, Art. 5 §§ 26-5; 26-6.  The BCLWO is different from the MLWL in that it contains no private right of action.  Instead, the BCLWO only permits aggrieved employees an administrative remedy—filing a complaint with the Wage Commission.  Balt. City Code, Art. 5 § 26-8.

Plaintiff Drivers argue that it is undisputed that they were not paid wages consistent with the BCLWO by Davi, that Transdev did not maintain pay records as required by the BCLWO, and that they are entitled to wages under the BCLWO.  (ECF No. 142-1, at 56-57).  Of course, Plaintiff Drivers' have no right to sue under the BCLWO, so they have sued under the MWPCL, alleging that the BCLWO "does create an entitlement to wages, and those wages may be recovered through the MWPCL."  (*Id.* at 57; ECF No. 181, at 31).

Transdev responds that no court has permitted a violation of the BCLWO to be enforceable through the MWPCL, that a court in

this District previously declined to enforce the BCLWO through the MWPCL, and that this amounts to an end run around the lack of a private right of action in the BCLWO, which Baltimore City could not have created because the Baltimore City Council does not have constitutional authority to create private causes of action. (ECF No. 172-1, at 51); *Gaither v. Davi Transportation Services, LLC*, No. 18-cv-1447-ELH, 2020 WL 2614783, at *9-10 (D.Md. May 22, 2020); *Bourgeois v. Live Nation Entm't, Inc.*, 3 F.Supp.3d 423, 452 (D.Md. 2014).

Plaintiff Drivers' have not established that a municipal ordinance which does not and cannot constitutionally contain a private right of action is nonetheless enforceable through a lawsuit under the MWPCL. Moreover, as with their MLWL claim, Plaintiff Drivers have not shown that Transdev was liable to them for Davi's failure to pay the Baltimore City living wage. Plaintiff Drivers' motion for summary judgment as to their BCLWO-MWPCL claim will be denied.

Additionally, because a purported violation of the BCLWO cannot be enforced through the MWPCL it is thus appropriate to enter summary judgment for Transdev against the twelve Plaintiff Drivers' BCLWO-MWPCL claim. *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017) (holding a district court "may enter summary judgment *sua sponte* 'so long as the losing party was on notice that [he or she] had to come forward with all of

[his or her] evidence.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).

    **c.   Third-Party Beneficiary Claims**

Plaintiff Drivers move for summary judgment for liability on their two breach of contract claims—Counts V and VI. (ECF No. 142, at 2). They argue that they are third-party beneficiaries under the BCHD and MTA Contracts, and that Transdev breached the Contracts' provisions incorporating the BCLWO and MLWL by not complying with those living wage laws. (ECF No. 158-1, at 24-25). Transdev cross-moved for summary judgment on the same counts against all of the Plaintiffs. (ECF No. 172, at 2).

Plaintiff Drivers assert that the "*only* purpose" of the living wage provisions in the BCHD and MTA Contracts "was to benefit workers such as Plaintiffs[,]" and thus Plaintiff Drivers were third-party beneficiaries. (ECF No. 142-1, at 59 (emphasis in original)). They cite two out of jurisdiction cases in which courts found employees to be third-party beneficiaries of government contracts. (*Id.*); *see Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008) (holding under California law that plaintiffs were third-party beneficiaries to a government contract under which the defendant promised to comply with a county living wage ordinance); *Berry v. Transdev Services, Inc.*, No. 15 Civ. 1299, 2017 WL 1364658 (W.D.Wash. Apr. 14, 2017) (holding under Washington law that plaintiffs were third-party beneficiaries and

were due breaks at work).   Transdev asserts in response that the
BCHD and MTA Contracts "do not indicate any intent, let alone a
'clear intent,' that Plaintiffs are intended beneficiaries."  (ECF
No. 172-1, at 45).   Transdev likewise cites an out of jurisdiction
case for support, *Harris v. Med. Transp. Mgmt.*, 300 F.Supp.3d 234
(D.D.C. 2018).

The stated purpose of the BCHD Contract was to provide medical
transportation services to the City of Baltimore.  (ECF No. 142-
5, at 5).   The BCHD Contract contained a "Notice to Contractors"
section that detailed the requirements of the BCLWO, which included
paying a "Living Wage," and reproduced the BCLWO section that
requires contractors to submit payroll reports to Baltimore City.
(ECF No. 142-5, at 32-34).   The living wage provision states:

> The Baltimore City Code (Edition 2000, Art. 5,
> Subtitle 26 "Hours and Wages – Service
> Contracts") establishes what is more commonly
> referred to as the City's "Living Wage"
> requirement.    Contractors having service
> contracts with the City are required, among
> other things, to pay their non-professional
> employees a "Living Wage" to be determined
> each year by the Board of Estimates.
> Contractors must become thoroughly familiar
> with the "Living Wage" requirement.  A copy of
> the City Code can be found on the City's
> website (www.baltimorecity.gov).

(*Id.* at 32).

The stated purpose of the MTA Contract was to operate ADA
paratransit services for the MTA's "Mobility" program.  (ECF No.
142-2, at 10).   The MTA Contract contained provisions requiring

Transdev to comply with the MLWL, as well as an affidavit of agreement to comply with the MLWL and ensure subcontractors comply with the rate requirements of the MLWL. (ECF No. 142-2, at 78-81). The living wage provision states:

> This solicitation is subject to the Living Wage requirements under Title 18, State Finance and Procurement Article, Annotated Code of Maryland and the regulations proposed by the Commissioner of Labor and Industry. The Living Wage generally applies to a Contractor or Subcontractor who performs work on a State contract for services that is valued at $100,000 or more. An employee is subject to the Living Wage if he/she is at least 18 years old or will turn 18 during the duration of the contract; works at least 13 consecutive weeks on the State Contract and spends at least one-half of the employee's time during any work week on the State Contract. The Living Wage Law does not apply to an employee who works less than thirteen consecutive weeks and full-time on a contract subject to the Living Wage.

(*Id.* at 78). The living wage affidavit of agreement states:

> The Undersigned, being an authorized representative of the above named Contractor, hereby affirms our commitment to comply with Title 18, State Finance and Procurement Article, Annotated Code of Maryland and, if required, to submit all payroll reports to the Commissioner of Labor and Industry with regard to the above stated contract. The Bidder/Offeror agrees to pay covered employees who are subject to living wage at least the living wage rate in effect at the time service is provided for hours spent on State contract activities, and to ensure that its Subcontractors who are not exempt also pay the required living wage rate to their covered employees who are subject to the living wage for hours spent on a State contract for services. The Contractor agrees to comply

51

> with, and ensure its Subcontractors comply
> with, the rate requirements during the initial
> term of the contract and all subsequent
> renewal periods, including any increases in
> the wage rate established by the Commissioner
> of Labor and Industry, automatically upon the
> effective date of the revised wage rate.

(*Id.* at 81).

"Under Maryland law, individuals who are not parties to a contract may nevertheless have standing to enforce the contract if they meet the requirements for third-party beneficiaries." *Amaya v. DGS Constr., LLC*, No. 16-cv-3350-TDC, 2019 WL 3945933, at *4 (D.Md. Aug. 21, 2019). Maryland follows the Restatement (Second) of Contracts, which states that:

> (1) unless otherwise agreed between promisor
> and promisee, a beneficiary of a promise is an
> intended beneficiary if recognition of a right
> to performance in the beneficiary is
> appropriate to effectuate the intention of the
> parties and either
>
> > (a) the performance of the promise will
> > satisfy an obligation of the promisee to
> > pay money to the beneficiary; or
>
> > (b) the circumstances indicate that the
> > promisee intends to give the beneficiary
> > the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary
> who is not an intended beneficiary.

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 459 (2012) (quoting Restatement (Second) of Contracts § 302 (Am.Law.Inst. 1981).

Judge Chuang recently summarized Maryland's approach to third-party beneficiaries:

In assessing whether an individual is a third-party beneficiary, a court should "look to 'the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention.'" [*Tower I*, 56 A.3d] at 213 (quoting *Ferguson v. Cramer*, 709 A.2d 1279, 1283 (Md. 1998)); see *Volcjak v. Wash. Cty. Hosp. Ass'n*, 723 A.2d 463, 477-78 (Md. Ct. Spec. App. 1999).

When evaluating the contract, intent must be "garnered from the terms considered as a whole, and not from the clauses considered separately." *Laurel Race Course v. Regal Constr.*, 333 A.2d 319, 327 (Md. 1975). One "crucial fact" to consider is "whether the pertinent provisions in the contract were 'inserted to benefit' the third party." [*Tower I*], 56 A.3d at 212 (alteration omitted) (quoting *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009)). While not dispositive, "whether the third party is named in the contract or its 'antecedent agreements'" is another key factor. *Id.* at 212 (quoting *Lovell Land*, 969 A.2d at 297-98; see *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 298 (Md. 2009). Whether the contract expressly gives enforcement power to the putative third-party beneficiary also bears on the analysis. *Long Green Valley Ass'n v. Bellevale Farms Inc.*, 46 A.3d 473, 485-86 (Md. Ct. Spec. App. 2012), *aff'd*, 68 A.3d 843 (Md. 2013). The provisions purporting to create the third-party interest should be "central" to the contract as a whole, rather than merely "peripheral." [*Tower I*], 56 A.3d at 213. In assessing the parties' intent, consideration of extrinsic evidence is permitted. Id. at 213 n.61.

"Maryland law is quite restrictive on the issue of whether one may be considered a third-party beneficiary." *CX Reinsurance Co., Ltd. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016), *aff'd*, 691 F. App'x 130 (4th Cir.

> 2017).   In particular, Maryland courts focus
> on whether the third party is the "primary
> party in interest."   [*Tower I*], 56 A.3d at
> 213.   "It is not enough that the contract may
> operate to [the plaintiff's] benefit.   It must
> clearly appear that the parties intend to
> recognize [the plaintiff] as the primary party
> in interest and as privy to the promise."
> *Mackubin v. Curtiss-Wright Corp.*, 57 A.2d 318,
> 321 (Md. 1948); *Volcjak*, 723 A.2d at 478
> (quoting *Weems v. Nanticoke Homes, Inc.*, 378
> A.2d 190, 195 (Md. Ct. Spec. App. 1977)).

*Amaya*, 2019 WL 3945933, at *4–5.   "[A] third[-]party qualifies as a third[-]party beneficiary of a contract only if the contracting parties intend to confer standing to enforce the contract upon that party."   *Volcjak*, 124 Md.App. at 509 (citing *Flaherty v. Weinberg,* 303 Md. 116, 125 (1985)).

"'Construction of a contract is generally a matter of law for the court,' including 'whether the parties intended a third[-]party to have standing to enforce ... contractual provisions[.]'"   *Long Green Valley*, 205 Md.App. at 655 (quoting *Volcjak*, 124 Md.App. at 509).   "[A]lthough, technically, who was intended to benefit from the covenant, with the correlative right to enforce the restrictions, presents a fact question which turns upon the intentions of the original parties to the agreement."   *Id.* (cleaned up).   As neither party has raised a genuine dispute of material fact as to the language of the contract, the only question is whether the parties intended a third-party to have standing to enforce the contract, and thus one of contract construction and law.

The contracts in this case were formed to provide transportation services. The contracts state that government contractors, such as Transdev, must comply with the respective living wage laws, but neither contract states that Plaintiff Drivers are to be third-party beneficiaries. Nor does either contract state that Plaintiff Drivers have the power to enforce the contracts. *Long Green Valley*, 205 Md.App. at 656-57. Neither contract states that Plaintiff Drivers are to be the primary parties in interest to the contracts, that they are to be in privity with Transdev and either BCHD or MTA, or that they will have standing to enforce the contracts. *Amaya*, 2019 WL 3945933, at *4-5; *Volcjak*, 124 Md.App. at 509.

The living wage provisions, furthermore, are not central to the contracts, but are peripheral provisions that do not indicate intent to make Plaintiff Drivers third party beneficiaries. The Court of Appeals of Maryland addressed the impact of peripheral contract provisions on the third-party beneficiary analysis in *Tower I*. There, tenants of two adjacent buildings each claimed third-party beneficiary status in the lease agreement for the other building because the leases included provisions for easements between the two properties and plans for the development of common areas. The court compared the *Tower I* leases with those in two other cases where it had found third-party beneficiaries—*Shillman v. Hobstetter*, 249 Md. 678 (1968) and *Prescott v. Coppage*, 266 Md.

562 (1972).  *Tower I*, 429 Md. at 459-60.  The court held that the
leases in *Tower I* were unlike the contracts in *Shillman* and
*Prescott*, because the *Shillman* and *Prescott* contracts were
"created specifically to benefit the third parties in question."
*Id.*  In other words, the third-party beneficiaries in *Shillman* and
*Rogers* were the "primary part[ies] in interest" because the
provisions naming them "were obviously 'inserted . . . to benefit'
them."  *Id.*  In contrast, the Court of Appeals held that the lease
agreements in *Tower I* were entered into first and foremost for the
benefit of the parties signing them, and that the provisions which
the tenants claimed created third-party beneficiary status were
only peripheral to the leases because they simply described the
joint nature of the two leases.  *Id.* at 459-60.  Thus, the "crucial
fact" that the tenants were owed a duty under the contracts was
missing.  *Id.*

In this case, the living wage provisions are likewise
peripheral.  The contracts were created to provide transportation
services, not to provide a benefit to Plaintiff Drivers.  Unlike
in *Shillman* and *Prescott*, the living wage provisions are neither
the only nor the central provisions of the contracts.  Thus, the
same implication that third parties were the primary parties in
interest and owed a duty under the contracts does not exist here,
just as it did not exist in *Tower I*.  *Id.* at 459-60.  Similarly,
the text of the contracts does not establish that the living wage

provisions "were obviously 'inserted . . . to benefit'" Plaintiff Drivers.  *Id.* at 459.  The living wage provisions only recite the obligation of government contractors to pay wages at a certain rate under city and state law.  The provisions do not state the intention behind their inclusion, nor that Plaintiff Drivers are owed a contractual duty.  *C.f.*, *Harris*, 300 F.Supp.3d at 252-53 (requiring government service contract's compliance with the District of Columbia's Living Wage Act was not evidence of the parties' intent, but of the City Councils' in creating the Living Wage Act, and thus was not evidence that the contractors intended to make plaintiffs third-party beneficiaries).

It is not enough that the contracts benefit Plaintiff Drivers. *Amaya*, 2019 WL 3945933, at *4-5.  The contracting parties must have intended Plaintiff Drivers to be the primary parties in interest to the contracts, to be in privity with the contracting parties, and to have standing to enforce rights under the contract. *Id.*; *Volcjak*, 124 Md.App. at 509.  That intention is not present on the face of either contract, and provisions benefitting third parties do not, alone, establish such intent.[8]  *C.f., Volcjak*, 124 Md.App. at 509 (finding plaintiff-doctors not third-party beneficiaries despite benefitting from provisions and being

---

[8] The parties have not provided any other evidence by which the contractors' intent can be assessed.

explicitly mentioned in contract, because the stated purpose of contract provisions was to reduce liability of hospital).

Lastly, Plaintiff Drivers' citations to *Amaral* and *Berry* are unavailing. The BCHD and MTA Contracts are analyzed under Maryland law, not California or Washington law. As previously noted, Maryland's third-party beneficiary law is "quite restrictive." The application of Maryland law to the undisputed facts of this case produces a different result than was reached in *Amaral* or *Berry*.

There is no genuine dispute of material fact regarding the text of the BCHD and MTA Contracts. The language of the contracts does not establish that the contracting parties intended to give third-party beneficiaries standing to enforce the contracts. Thus, Plaintiff Drivers have failed to show that they are entitled to judgment. On the other hand, Transdev has shown that it is entitled to judgment against all thirteen plaintiffs on these two claims.

**d. Issues on Which Transdev Also Moves for Summary Judgment**

Transdev moves for summary judgment that it is not liable under the MWHL to Monica Jones and Deandre Banks because they are stepchildren of James Davis, Davi's owner. (ECF No. 172-1, at 41-42). The MWHL does not apply to an individual who is "a child, parent, spouse, or other member of the immediate family of the employer." Md. Code Ann. Lab & Emp. § 3-403(6). Child, as used

in the MWHL, means a stepchild.  COMAR 09.12.41.11.  Monica Jones and Deandre Banks are not relatives of Transdev or its officers. Moreover, Transdev has not forecasted any evidence that James Davis was an employer of Plaintiffs Jones and Banks.  Transdev is not entitled to judgment as a matter of law on this issue and its motion on this ground will be denied.

   **e.   Plaintiff Deandre Banks**

   The status of Plaintiff Deandre Banks differs from that of the other twelve Plaintiffs.  First, whether Plaintiff Banks was employed by Transdev is genuinely disputed and must be resolved at trial.  Second, if Plaintiff Banks succeeds in establishing a violation of the FLSA and the MWHL, he may attempt to prove he is entitled to liquidated damages under the FLSA or treble damages under the MWPCL.  He must still establish, however, that the three-year statute of limitations under the FLSA applies to him.  He may also attempt to prove that Transdev is liable to him under the MWPCL for violations of the BCLWO.  Plaintiff Banks cannot, however, proceed with either the MLWL direct action, the MLWL as a violation of the MWPCL claim, or the third-party beneficiary breach of contract claims, because the grant of summary judgment on those claims in favor of Transdev will be against all thirteen Plaintiffs.

## III. Plaintiffs' Motion to Strike Affirmative Defenses

Plaintiffs originally brought their claims as a collective action, and several individuals joined the action as opt-in plaintiffs. Plaintiffs then moved to convert the opt-in plaintiffs to named plaintiffs. When that motion was granted, Plaintiffs filed an amended complaint adding the former opt-in plaintiffs as named plaintiffs. (ECF No. 158). In response, Transdev filed an answer to the amended complaint which added an additional nineteen affirmative defenses to the four it raised in its initial answer. (ECF No. 164). Plaintiffs move to strike fifteen of the new affirmative defenses under Federal Rule of Civil Procedure 12(f). (ECF No. 175). Those affirmative defenses are:

> **Fourth Affirmative Defense:** Transdev alleges that any recovery in Plaintiff's Amended Complaint, or any purported cause of action alleged therein, is barred because the alleged damages were not proximately caused by any conduct of Transdev as alleged or otherwise.

> **Fifth Affirmative Defense:** Plaintiffs' claims, as set forth in the Amended Complaint are barred, in whole or in part, by the applicable statute of limitations. Further, the applicability of the statute of limitations requires individualized determinations for each Plaintiff.

> **Sixth Affirmative Defense:** Plaintiffs' claims are barred, at least in part, by the applicable statute of limitations, specifically the FLSA's two-year statute of limitations or alternatively, FLSA's three-year statute of limitations.

> **Eighth Affirmative Defense:** Any claims by Plaintiffs accruing more than three years

prior to the filing of this Amended Complaint
are untimely and barred by the applicable
statute of limitations under the Maryland Wage
and Hour Law ("MWHL"), Md. Code Ann., Lab. &
Empl. §§ 3-401 *et seq.*; the Maryland Wage
Payment and Collection Law ("MWPCL"), Md. Code
Ann., Lab. & Empl. §§ 3-501 *et seq.*; the
Maryland Living Wage Law ("MLWL").

**Ninth Affirmative Defense:** One or more of
Plaintiffs' claims are barred by waiver,
estoppel, laches and/or unclean hands.

**Tenth Affirmative Defense:** Assuming,
*arguendo*, Plaintiff Deandre Banks is an
employee under the FLSA and/or Maryland law,
Plaintiff Deandre Banks' claims are barred
from the overtime provisions of the FLSA,
pursuant to one or more of those statutory
exemptions set forth in 29 U.S.C. § 213.

**Twelfth Affirmative Defense:** At all relevant
times Transdev honestly and in good faith
intended to ascertain the FLSA, MWHL, MWPCL,
and MLWL requirements and to comply with them.

**Thirteenth Affirmative Defense:** To the extent
that this Court finds there is any liability
(which Transdev denies), Transdev is entitled
to a set-off for any amounts already paid as
wages to which Plaintiffs were not entitled,
including without limitation payment for hours
during which they were not working.

**Fourteenth Affirmative Defense:** Transdev has
no knowledge, nor should it have had
knowledge, of any alleged uncompensated work
by the Plaintiffs.

**Fifteenth Affirmative Defense:** Plaintiffs'
own voluntary misconduct, contributory
negligence, and/or job performance were the
proximate cause of any alleged injuries or
damages.

**Sixteenth Affirmative Defense:** Plaintiffs
have failed to mitigate any damages.

61

**Nineteenth Affirmative Defense:** Some or all of Plaintiffs' claims are barred to the extent they have failed to exhaust all administrative remedies.

**Twentieth Affirmative Defense:** The Amended Complaint, and each cause of action thereof, is barred — or the damages flowing therefrom reduced — because Plaintiffs failed to notify Transdev of the alleged violations at the time such violations allegedly occurred, which prevented Transdev from taking any action to remedy such alleged violations.

**Twenty-First Affirmative Defense:** To the extent there were complaints about unpaid wages, all actions taken by Transdev were timely and appropriate and constituted prompt, effective remedial measures under the circumstances, and these actions by Transdev bar or preclude the Plaintiffs' claims.

**Twenty-Second Affirmative Defense:** Transdev maintained accurate records in accordance with the Fair Labor Standards Act 29 U.S.C. § 201 *et seq.*, MWHL, MWPCL, and MLWL.

Plaintiffs assert that (1) affirmative defenses four, five, six, eight, nine, ten, twelve, thirteen, fifteen, sixteen, nineteen, twenty-one, and twenty-two are not pled with sufficient facts to meet the *Twombly-Iqbal* heightened pleading standard; (2) affirmative defenses five, six, eight, nine, ten, thirteen, fifteen, sixteen, nineteen, and twenty-one are waived; (3) affirmative defenses four, nine, thirteen, fifteen, sixteen, and nineteen do not apply in FLSA cases because they are negligence and equitable defenses; and (4) affirmative defenses fourteen and twenty are barred by a sanctions order. (ECF No. 175-1).

Plaintiffs' arguments will be considered out of order to resolve the motion more efficiently.  Moreover, as will be explained, some of the defenses are mooted by the resolution of the cross-motions for summary judgment.

A.    **Standard of Review**

Under Rule 12(f), district courts may strike "insufficient defenses" that are insufficient as a matter of law or pleading. Fed.R.Civ.P. 12(f); JAMES M. WAGSTAFFE, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL, NATIONAL EDITION, § 9.378.  District courts in this district have mostly, if not unanimously, applied the heightened *Twombly-Iqbal* pleading standard to affirmative defenses, because "it would be incongruous and unfair to require a plaintiff to operate under one standard and to permit the defendant to operate under a different, less stringent standard." *Holden v. Bwell Healthcare Inc.*, No. 19-cv-760-SAG, 2020 WL 1285505, at *5 (D.Md. Mar. 18, 2020) (quoting *Ultimate Outdoor Movies v. FunFlicks, LLC*, No. 18-cv-2315-SAG, 2019 WL 3323221, at *2 (D.Md. July 24, 2019)); *Aguilar v. City Lights of China Rest., Inc.,* No. 11-cv-2416-DKC, 2011 WL 5118325, at *3-4 (D.Md. Oct. 24, 2011).  *Bell Atlantic Corp. v. Twombly* requires that allegations be more than "labels or conclusions," and that facts must be set forth demonstrating the claim is "plausible on its face."  550 U.S. 544, 555, 570 (2007).  *Ashcroft v. Iqbal* further states "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." 556 U.S. 662, 678 (2009).

Motions to strike are "generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and ... is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (quoting CHARLES ALAN WRIGHT, ET AL., FEDERAL PRAC. & P. § 1380 647 (2d ed. 1990)). Therefore, a court should review such motions "in a light most favorable to the pleader" and, if granted, give the pleader leave to amend. *Ulyssix Techs., Inc. v. Orbital Network Eng'g, Inc.*, No. 10-cv-02091-ELH, 2011 WL 631145, at *14 (D.Md. Feb. 11, 2011) (internal citation omitted). "The decision whether to strike an affirmative defense is discretionary and courts generally refrain from striking affirmative defenses absent a showing that not doing so would unfairly prejudice the movant." *Lockheed Martin Corp. v. United States*, 973 F.Supp.2d 591, 592 (D.Md. 2013).

### B.   Not an Affirmative Defense

Plaintiffs assert that the fourth affirmative defense, Plaintiffs' failure to establish proximate cause, is not an affirmative defense at all. (ECF No. 180, at 5). Plaintiffs are correct. It is an argument that Plaintiffs have not proven their case. It will be struck for all Plaintiffs, although Transdev may make the argument at trial.

C.   **Applicability to an FLSA Action**

Plaintiffs assert that the fourth, ninth, thirteenth, fifteenth, sixteenth, and nineteenth affirmative defenses are inapplicable in an FLSA case, and that including the defenses prejudices Plaintiffs by confusing the issues. (ECF No. 175-1, at 7). The fourth has already been struck, but the remaining defenses will be considered. Transdev responds, without citing authority, that this case includes not only the FLSA claims, but also state law claims, and that these defenses are available under state law. (ECF No. 179, at 12).

Transdev's argument is unconvincing. As discussed above, summary judgment will be granted on the breach of contract claims. Thus, the only remaining state law claims are the claims brought under Maryland's wage laws—the MWHL and the MWPCL. The parties do not discuss whether the inapplicability of an affirmative defense to the FLSA means it is likewise inapplicable to the MWHL or MWPCL. All three statutes, however, protect the rights of workers to be paid correctly by their employer. The MWHL is the "State parallel" of the FLSA. *Newell v. Runnels*, 407 Md. 578, 649 (2009). The MWHL and MWPCL, when read together, "allow employees to recover unlawfully withheld wages from their employer, and provide an employee with two avenues to do so." *Peters*, 439 Md. at 653. The Court of Appeals of Maryland has "reject[ed]" interpretations of the MWPCL that "restrict its application." *Id.* at 654. As

previously discussed, the economic realities test of the FLSA is used to determine if an entity is an employer under the MWPCL. *See Campusano*, 208 Md.App. at 38.   Moreover, the MWPCL, like the FLSA, is a "remedial statute to be construed liberally in favor of the employee[.]"   *Id.* at 661.   *See Newell*, 407 Md. at 650 (["Employer] is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.").   *See also Bocangel v. Warm Heart Family Assistance Living, Inc.*, No. 8:16-cv-03989-PX, 2020 WL 869222, at *4 n.4 (D.Md. Feb. 21, 2020) ("The standards governing the FLSA's scope, including the economic reality test, apply to the MWHL and the MWPCL.   Thus, as is often the case, Plaintiff's state law claims 'stand[] or fall[] on the success of the[ir] . . . claim under the FLSA.'").   As a result, whether an affirmative defense is applicable will be treated the same for all three statutes.

The ninth affirmative defense asserts four defenses: waiver, estoppel, laches, and/or unclean hands.

FLSA claims are generally not subject to the defense of waiver.   *See Hackett v. ADF Restaurant Investments*, 259 F.Supp.3d 360, 364 (D.Md. 2016) ("[The FLSA's] provisions are mandatory and generally not subject to bargaining, waiver, or modification by contract or settlement.") (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945)).   This is, in part, because "Congress enacted the FLSA to protect workers against being paid deficient

wages and working long hours that may result from significant inequalities in bargaining power between employers and employees." *Id.  See also* Md. Code Ann. Lab. & Emp. § 3-405 ("An agreement to work for less than the wage required under this subtitle is void."); Md. Code Ann. Lab. & Emp. § 3—502(f) ("An agreement to work for less than the wage required under this subtitle is void."); *Martinez v. K & S Management Services, Inc.*, No. 15-cv-223-PWG, 2016 WL 808797, at *5 (D.Md. Mar. 2, 2016) (recognizing that the MWHL and MWPCL declare void an agreement to work for less than the statutory wage, and quoting *O'Neil*, 324 U.S. at 704, for proposition that "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy."). The defense of waiver is inapplicable.

Neither party addresses estoppel in detail.  It seems, however, there is a circuit split over the applicability of equitable estoppel in an FLSA action, and that the Fourth Circuit has thus far not addressed the question. *See Smith v. ABC Training Center of Maryland, Inc.*, No. 13-cv-306-JFM, 2013 WL 3984630, at *9-10 (D.Md. Aug. 1, 2013) (summarizing circuit split).  Courts in this district, however, have rejected estoppel defenses.  In *Smith*, Judge Motz rejected the defendant's assertion of equitable estoppel, because plaintiffs do not need to prove compliance with hours reporting requirements, as long as they can prove the

defendant had knowledge of their overtime hours. *Id.* at 10. *See also*, *Richardson v. Alliance Residential Company*, No. 18-cv-1114-ELH, 2020 WL 551316, at *11 (D.Md. Feb. 4, 2020) (citing *Smith* and rejecting application of estoppel to an FLSA claim because it appears to "improperly shift the obligation to keep accurate work records from the employer to the employee"). *Cf. Newell*, 407 Md. at 655 (holding plaintiff must show employer had actual or constructive knowledge of overtime work for FLSA and MWHL claims). The defense will be struck as inapplicable.

Laches is inapplicable in an FLSA action. *See Long v. Welch & Rushe, Inc*, 28 F.Supp.3d 446, 463 (D.Md. 2014) ("But when a cause of action is 'brought pursuant to a statute for which Congress has provided a limitations period, a court should not apply laches to overrule the legislature's judgment as to the appropriate time limit to apply for actions brought under the statute.'"); *Guzman v. D & S Capital, LLC*, No. 14-cv-1799-MAB, 2015 WL 772797, at *5 (D.Md. Feb. 20, 2015) ("As such, courts will not apply the doctrine of laches to legislatively created causes of action, particularly when accompanied by a statute of limitations."). Neither party addressed whether the laches defense was applicable to an MWHL or MWPCL action. The court did not find any cases addressing the applicability of laches to MWHL or MWPCL actions. Given the closeness with which the three statutes are treated, and Maryland's three-year statute of limitations, the defense is likewise found

inapplicable for the MWHL and MWPCL actions.  Md. Code Ann., Cts. & Jud. Proc. § 5-101.

The parties' discussions on the applicability of the doctrine of unclean hands, again, leaves much to be desired.  Some courts have expressed confusion over whether the unclean hands defense is applicable to an FLSA claim.  *See Tran v. Thai*, Civil Action No. H-08-3650, 2010 WL 5232944, at *7 (S.D.Tx. Dec. 16, 2010) ("It is unclear whether the equitable defenses of waiver, estoppel, unclean hands, and laches are available under the FLSA.").  As with waiver, estoppel, and laches, however, courts concluding that the doctrine of unclean hands is not applicable are persuasive. Essentially, the doctrine of unclean hands is an equitable doctrine which is inapplicable to FLSA claims, as FLSA claims are brought at law.  *See, e.g.*, *Alonso Vazquez v. Azoulay*, 834 Fed.Appx. 653, 655 (2d Cir. 2021) (holding doctrine of unclean hands inapplicable in case involving claims under the New York State Labor Law, which sets minimum and overtime wage rates); *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 464 (S.D.N.Y. 2008) (finding doctrine of unclean hands inapplicable because court was not invoking equitable powers in adjudicating FLSA claim, and because defendants failed to adduce evidence showing plaintiffs engaged in conduct); *Lopez v. Autoserve, LLC*, No. 05 C 3554, 2005 WL 3116053, at *1 (N.D.Ill. Nov. 17, 2005) (striking unclean hands defense against claims under the FLSA and Illinois Minimum Wage Law Act

because plaintiff only sought legal damages and unclean hands was an equitable remedy not applicable to claims for monetary relief); *Espinoza v. Mex-Am Café, LLC*, No. 1:14CV30, 2015 WL 5431949, at *6 n.4 (M.D.N.C. Sept. 15, 2015)("To the extent Defendants seek to reassert their equitable defenses [,including unclean hands,] Defendants should offer some explanation of their relevance given the lack of any request for equitable relief by Plaintiffs."). The affirmative defense of unclean hands will be struck because of the broad, remedial nature and goals of the three statutes under which Plaintiffs' claims are brought, and because Plaintiffs are not seeking equitable relief.  Thus, the ninth affirmative defense in its entirety will be struck as inapplicable.

The thirteenth affirmative defense asserts that Transdev may "set-off" against the wages it owes plaintiffs any wages that it previously overpaid to plaintiffs.  Plaintiffs' argument that set-offs are categorically prohibited in FLSA cases is not supported by Plaintiffs' own citations, or the court's own research. Plaintiffs cite *Perez-Nunez v. North Broward Hosp. Dist.*, which states that doctrines of payment, set-off, and accord and satisfaction are *generally* not applicable to FLSA claims.  No. 08-61583-CIV, 2009 WL 723873, at *2 (S.D.Fl. Mar. 13, 2009).  *Perez-Nunez* derived that rule from a series of cases going back to the Fifth Circuit's decision in *Brennan v. Heard*, 491 F.2d 1 (5th Cir. 1974).  The Fifth Circuit, however, has since clarified its

approach to set-offs: "We continue to look with disfavor on set-offs unless the money being set off can be considered wages that the employer pre-paid to the plaintiff-employee." *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 742 (5th Cir. 2010). *See also Ketner v. Branch Banking and Trust Company*, 1:14cv967, 2016 WL 3566222, at *6 (M.D.N.C. June 27, 2016) (analyzing *Martin* and rejecting defendant's assertion of set-off affirmative defense because it did not involve prepaid wages). Transdev's asserted set-off defense is of the same ilk—that Transdev overpaid Plaintiffs and is entitled to set off the overpayment. *Cf. Martin*, 628 F.3d at 741 (explaining in prior case defendant city had been allowed to assert set-off in FLSA suit because some plaintiffs had been overpaid). Thus, Plaintiffs' motion with regard to the defense of set-off will not be granted on this ground.

The fifteenth affirmative defense asserts that Plaintiffs' own voluntary misconduct, contributory negligence, and/or job performance proximately caused their injuries. Plaintiffs and Transdev both fail to cite a single case for the proposition that a contributory negligence claim is, or is not, applicable to an FLSA action. The court has searched for such a case and found only an observation from the United States District Court for the Northern District of Oklahoma that contributory negligence was a "clearly irrelevant defense" in an FLSA action. *Perez v. El Tequila, LLC*, No. 12-CV-588-JED-PJC, 2015 WL 4173541, at *12

(N.D.Ok. July 10, 2015).   This is likely because contributory negligence is a negligence principle: "Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, co-operating with the negligence of the defendant in bringing about the plaintiff's harm."  RESTATEMENT (FIRST) OF TORTS § 463 (1934).   Plaintiffs' claims do not involve negligence.   The FLSA, MWHL, and MWPCL are statutes that do not consider negligence, but whether an employer has paid, or not paid, the plaintiff the wages he or she is owed.   The contributory negligence defense will be struck as inapplicable.

The sixteenth affirmative defense asserts that Plaintiffs failed to mitigate any damages.   Courts have frequently found that a duty to mitigate is inapplicable to FLSA claims.   *Espinoza*, 2015 WL 5431949, at *6 (finding affirmative defense of mitigation "irrelevant") (citing *Rodriguez v. Physician Lab. Servs., LLC.*, No. 7:13-CV-622, 2014 WL 847126, at *3 (S.D.Tex. Mar. 4, 2014) ("[C]ourts routinely find as a matter of law that the FLSA does not require employees to mitigate damages . . . It would be odd, for instance, to require underpaid employees to work extra hours to offset unpaid wages.")); *Cava v. Tranquility Salon & Day Spa, Inc.*, No. 13-CV-1109(JS)(ARL), 2014 WL 655372, at *4-5 (E.D.N.Y. Feb. 20, 2014) ("[The plaintiff] seeks compensation for past legally required wages.   It is unclear how one could mitigate such

72

damages . . . [t]his defense is wholly immaterial and improperly suggests a duty that is not applicable to Plaintiff.")). *Espinoza* also rejects the applicability of mitigation to state law statutory wage claims.  2015 WL 5431949, at *6 n.5.  There, as here, there was an absence of authority addressing the applicability of the defense of mitigation to the North Carolina Wage and Hour Act ("NCWHA").  The FLSA and NCWHA claims, however, were both based on a failure to receive wages for past employment.  Thus, the logic foreclosing the defense of mitigation was applicable to the state claims as well.  The same appears true here.  The defense of mitigation will be struck as inapplicable.

The nineteenth affirmative defense asserts that Plaintiff Deandre Banks failed to exhaust his administrative remedies. Administrative exhaustion is not required in an FLSA case.  The FLSA "grants individual employees broad access to the courts . . . and no exhaustion requirements or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or created by the statute." *Aviles-Cervantes v. Outside Unlimited, Inc.* 276 F.Supp.3d 480, 489 (D.Md. 2017) (cleaned up) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981)).  The MWHL and MWPCL recovery provisions likewise do not require administrative exhaustion prior to an employee bringing a suit.  Md. Code. Ann. Lab. & Emp. §§ 3-427; 3-507.2.  The nineteenth defense will be struck.

### D.   Moot Affirmative Defenses Regarding Plaintiff Drivers

Several remaining affirmative defenses are moot as to Plaintiff Drivers' claims because of the resolution of the cross-motions for summary judgment: the twelfth, fourteenth, twentieth, twenty-first, and twenty-second.

Three of those defenses seem to assert that Transdev's actions bar Plaintiffs' claims: the twelfth that Transdev acted in good faith to ascertain and comply with statutory requirements; the twenty-first that Transdev's "prompt remedial measures" preclude Plaintiffs' claims; and the twenty-second that Transdev maintained accurate records.  These defenses are moot for Plaintiff Drivers' claims because Plaintiff Drivers are entitled to judgment that Transdev did not act in good faith and that Plaintiffs' wages were not withheld pursuant to a bona fide dispute.

The fourteenth affirmative defense that Transdev had no knowledge of Plaintiffs completing uncompensated work and the twentieth affirmative defense that Plaintiffs' claims are barred, or their damages reduced, because Plaintiffs failed to notify Transdev of wrong pay at the time they were wrongly paid are also both moot, but only with regard to Plaintiff Drivers.  It is not clear on what legal basis Transdev asserts that an alleged failure to report wrong wages at a certain time would bar liability or reduce damages.  Consequential damages, however, may be reduced if a defendant acts in good faith.  *See Tagre v. Continental USA*

*Kitchens & Baths, Inc.*, No. 14-cv-2467-DKC, 2015 WL 6736463, at *3
(D.Md. Nov. 4, 2015) ("The court can deny or reduce liquidated
damages if the defendant shows that the 'act or omission giving
rise to such actions was in good faith and that he had reasonable
grounds for believing that his act or omission was not a violation
of the [FLSA].'").  As already discussed, Plaintiff Drivers are
entitled to judgment on the questions of good faith and a bona
fide dispute about paying wages.  The viability of these defenses
with regard to Plaintiff Deandre Banks is discussed below.

> **E.  Sufficiency of Pleading**

Of the remaining defenses, Plaintiffs assert that the fifth,
sixth, eighth, tenth, twelfth, thirteenth, twenty-first, and
twenty second are insufficiently pleaded.  The tenth, twelfth,
twenty-first, and twenty-second are only applicable to Plaintiff
Deandre Banks at this point.

Three of those affirmative defenses assert statute of
limitations: the fifth that the "applicable statute of
limitations" bars Plaintiffs' claims; the sixth that either the
two- or three-year FLSA statute of limitations bars Plaintiffs'
FLSA claims; and the eighth that a three-year statute of
limitations from the filing date of the amended complaint bars
Plaintiffs' state law claims.  A statute of limitations affirmative
defense needs to identify the appropriate statute of limitations
and the operative dates.  *See Ulyssix*, 2011 WL 631145, at *16

("Defense 8 (statute of limitations) fails to reference the appropriate statute of limitations or the operative dates.  As such, it must also be stricken, without prejudice.").

The fifth and sixth affirmative defenses do not identify which Plaintiffs are barred, the time periods for which they believe Plaintiffs are barred from recovery, or even the operative employment dates of plaintiffs.  The eighth affirmative defense provides no factual or legal support for why the amended complaint would not relate back to the original complaint.  *See, e.g.*, Fed.R.Civ.P 15(c); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 467-68 (4th Cir. 2007).  This case is not the same, as Transdev suggests, as *Nickens v. State Employees Credit Union, Inc.*, where the defendant's answer admitted the dates and fact of plaintiffs' employment.  No. 13-cv-1430-RDB, 2014 WL 3846060, at *5 (D.Md. Aug. 4, 2014) (finding defendant supported statute of limitations affirmative defense with sufficient facts because it admitted dates and facts of employment).  Transdev has failed to support these affirmative defenses with sufficient facts.

The parties then dispute whether Plaintiffs have established that not striking these defenses will unfairly prejudice them.  It is true that courts in this jurisdiction have declined to find unfair prejudice when the only result is having to conduct additional discovery.  *See, e.g.*, *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. 13-cv-617-CCB, 2013 WL 3776933, at *9 (D.Md. Jul.

76

17, 2013) (finding argument that plaintiffs were prejudiced by having to expend discovery resources confronting defenses was unconvincing because either the defenses were meritless and there would be nothing for plaintiffs to litigate, or the defenses had merit and striking them with leave to amend would only delay inevitable litigation on the merits).  This case is different from those, however, because discovery already was completed when Transdev filed its amended answer with nineteen new affirmative defenses.  *See, e.g.*, *Synovus Bank v. Kimmel*, 1:11cv35, 2013 WL 12239113, at *2 (W.D.N.C. Apr. 16, 2013) ("[A]llowing amendment at this stage of litigation would prejudice Plaintiff.  Discovery is closed.  Summary judgment motions are due [in less than three weeks].  Allowing the amendment would deprive Plaintiff of the opportunity to conduct discovery on this affirmative defense unless this Court were to reopen discovery and postpone the trial in this case, which it cannot do.").

Frankly, it is not clear why either party is pursuing this fight.  Plaintiffs agree that the original Plaintiffs cannot, and do not, seek compensation for unpaid wages owed before April 12, 2016, because April 12, 2019 was when the parties entered an agreement to toll the statute of limitations.  (ECF No. 180, at 6).  Likewise, the opt-in Plaintiffs cannot and do not seek unpaid wages owed before November 18, 2016, because November 18, 2019, is the date set by the court for individuals to join the opt-in class.

(*Id.; see also* ECF No. 44, at 1 (Order Approving Conditional Certification of a Collective Action)).  Transdev seems to have asserted these defenses now because the amended complaint removed a paragraph from the original complaint which stated that Plaintiffs were seeking collective action status for drivers who worked in the period beginning three years prior to the date of the commencement of the action.  (ECF No. 179, at 10). Essentially, Transdev is trying to cover its bases and lock in the temporal boundaries of Plaintiffs' claim.  If that is all that Transdev seeks to do with these affirmative defenses, then Transdev should support the defenses with those facts if it amends.  Until that is done, all the Plaintiffs, both original and opt-in, are in the dark as to whether Transdev is simply asserting already agreed upon time limits to plaintiffs' claims, or invoking some new theory.  Plaintiffs are thus prejudiced.  *See, e.g.*, *Aguilar*, 2011 WL 5118325, at *3 (stating pleading requirements exist to ensure opposing party receives fair notice of the nature of a claim or defense).  The defenses will be struck without prejudice.

The thirteenth defense of set-off is likewise unsupported by facts.  Transdev did not allege any facts in support of this defense, nor did it point to any evidence of overpayment during summary judgment.  The prejudice is that Plaintiffs are even unable to begin to know where to look for evidence related to this defense, particularly now that discovery (and summary judgment)

have come and gone without Transdev supporting this defense.  This defense will be struck without prejudice.

The tenth, twelfth, twenty-first, and twenty-second defenses only apply to Plaintiff Deandre Banks at this point.  The tenth asserts that Plaintiff Deandre Banks's claims are barred from the overtime provisions of the FLSA pursuant to the statutory exemptions of 29 U.S.C. § 213.  The affirmative defense does not assert what exemptions apply or provide a factual basis for why they apply.  The twelfth defense of good faith does not identify any facts that make Transdev's assertion of good faith plausible.  The twenty-first merely states the unsupported legal conclusion that Transdev took timely, appropriate, and effective remedial measures barring or precluding Plaintiffs' claims.  The twenty-second asserts the unsupported legal conclusion that Transdev maintained accurate records in accordance with federal and state law.  None of these defenses were supported with facts.  Plaintiff Deandre Banks is prejudiced by the lack of factual support and being unable to seek discovery on these questions.  The defenses will be struck without prejudice.

### F.   Waiver

Plaintiffs assert that the fifth, sixth, eighth, ninth, tenth, thirteenth, fifteenth, sixteenth, nineteenth, and twenty-first affirmative defenses were waived by Transdev because they should have been, but were not, included in Transdev's first

answer.  Although all those defenses were disposed of, it is worthwhile addressing waiver because Transdev may attempt to amend defenses six, eight, nine, thirteen, and twenty-one.

Plaintiffs' argument seems to be that Transdev was required to plead all its affirmative defenses under Federal Rule of Civil Procedure 8 and, because Transdev failed to do so, the defenses can only be asserted in the amended complaint if they are related or proportionate to the changes made by Plaintiffs in the amended complaint.[9]

What Plaintiffs do not address, however, is that courts retain discretion before, during, and after trial to permit parties to amend and add affirmative defenses.  Such discretion is recognized by the Rules of Civil Procedure.  Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); Fed.R.Civ.P. 15(b) ("The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.  The court may grant a continuance to enable the objecting party to meet the

---

[9] Plaintiffs concede that the three statute of limitations defenses were not waived with respect to the opt-in Plaintiffs. (ECF No. 175-1, 6).  It seems odd, as Transdev points out, that this would not be true for all the affirmative defenses with respect to the opt-in plaintiffs.  (ECF No. 179, at 10-11).  This question does not need to be resolved now, however.

evidence."). Such discretion has been recognized by the Fourth Circuit:

> Although it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver . . . there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion.

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003). Such discretion is recognized by Plaintiffs' own citation: "A district court may, however, exercise its discretion to allow a late affirmative defense if the plaintiff does not suffer prejudice from the delay." *Burton v. Ghosh*, 961 F.3d 960, 965, 966 (7th Cir. 2020) (rejecting defendant's argument that district court is required to allow defendant to assert new affirmative defenses whenever a plaintiff files an amended complaint).

Plaintiffs' only alleged prejudice is that they are unable to take discovery on the defenses. (ECF No. 175-1, at 7). The question of waiver, and prejudice from waived defenses, does not need to be resolved right now. As discussed above, several of the defenses that Plaintiffs assert are waived will be struck because Transdev insufficiently supported them with facts, unfairly prejudicing Plaintiffs in the absence of discovery. If Transdev

81

seeks to amend its answer to replead the defenses with sufficient facts, then the court will consider prejudice and the need to take discovery on the defenses.

### G.   Prior Sanctions Order

Plaintiffs move to strike Transdev's fourteenth and twentieth affirmative defenses claiming they are precluded by a discovery sanctions order.  The discovery sanctions order stated: "Transdev is precluded from arguing that Transdev did not have knowledge that Plaintiffs complained of not being paid in accordance with applicable law." (ECF No. 163, at 1).

Whether Transdev knew of uncompensated work is a different question.  Transdev could know that Plaintiff Deandre Banks was complaining of incorrect pay, but not know of any actual instances of uncompensated work.  Similarly, that Plaintiff Deandre Banks complained to Transdev about incorrect pay does not mean Plaintiff Deandre Banks made those complaints when the violations occurred. Plaintiffs' motion to strike affirmative defenses fourteen and twenty will be denied.  These defenses may still be asserted against Plaintiff Deandre Banks.

Plaintiffs' motion will be granted in part and denied in part on its merits and denied in part as moot.

## IV.  Defendant's Motion to Dismiss Plaintiffs

Some time ago, while this case was referred to a magistrate judge to supervise discovery, Transdev moved pursuant to Federal

Rules of Civil Procedure 37(d) and 41(b) to dismiss four of the plaintiffs as a sanction for their failure to appear for depositions. (ECF No. 110). Two of the plaintiffs were original plaintiffs, Danielle McCoy and Tyree Miles, and two were opt-in plaintiffs, Stacey Smith and Joel Morrison. After the named Plaintiffs McCoy and Miles filed an opposition to the motion to dismiss, (ECF No. 122), Transdev filed a reply. (ECF No. 125).

Magistrate Judge Copperthite issued a show cause order on March 15, 2021, directing the other two, opt in plaintiffs Joel Morrison and Stacey Smith, to show cause within 21 days why they failed to appear for their depositions. They were advised that dismissal of the claims could result from a failure to respond. (ECF No. 149). No response appears in the record, and the entire motion remains pending.

Rule 37(b)(2) permits a district court broad discretion to impose certain punitive measures, up to and including dismissal, on any party who disobeys a discovery order. Fed.R.Civ.P. 37(b)(2)(A); *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 518 (D. Md. 2000) ("Federal district courts possess great discretion to sanction parties for failure to obey discovery orders."). With the sanction of dismissal or default, "the range of discretion is more narrow than when a court imposes less severe sanctions." *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995) (cleaned up). This is because dismissal of a

party's case for failure to comply with a court order or a discovery request "is a severe sanction which must be exercised with restraint, caution and discretion." *Zaczak v. Fauquier County, Va.*, 764 F.Supp. 1071, at 1077 (E.D.Va. 1991) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980); *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978)).

Similarly, Rule 37(d) allows the court to impose certain sanctions on a party who fails to respond to interrogatories; fails to respond to a request for inspection; or fails to appear for a properly noticed deposition. Fed.R.Civ.P. 37(d). Contrary to Rule 37(b), Rule 37(d) allows for the imposition of sanctions, including dismissal or entry of default judgment, even when the noncomplying party has not violated a court order. CHARLES ALAN WRIGHT, ET AL., FEDERAL PRAC. & P. § 2291 (3d ed. 2018) ("No court order is required to bring Rule 37(d) into play. It is enough that a notice of the taking of a deposition or a set of interrogatories or a request for inspection has been properly served on the party.").

Before ordering dismissal under Rule 37(b) or (d), the Court applies the four-factor *Wilson* test: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Mut.*

84

*Fed. Sav. & Loan Ass'n v. Richards & Assoc., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989) (citing *Wilson*, 561 F.2d at 503-06).

Rule 41(b) likewise grants the court authority to dismiss an action "[i]f the plaintiff fails to prosecute or to comply with ... a court order." Fed.R.Civ.P. 41(b). A request for dismissal under Rule 41(b) requires analysis of four nearly identical factors: "(1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal." *Hillig v. Comm'r*, 916 F.2d 171, 174 (4th Cir. 1990).

The two tests are combined when jointly assessing Fed.R.Civ.P. 37 and 41 because the legal standards for dismissal under both tests are "virtually the same." *Lance v. Megabus Ne., LLC*, No. 16-cv-3459-PWG, 2017 WL 3480800, at *2 (D.Md. Aug. 14, 2017) (quoting *Taylor v. Fresh Fields Market, Inc.*, No. 94-0055-C, 1996 WL 403787, at *2 (W.D.Va. June 27, 1996)).

### McCoy and Miles

Plaintiffs' opposition asserts that Transdev waived the necessary argument that Plaintiffs McCoy and Miles acted in bad faith or callous disregard for the court's authority and that they had actively and meaningfully participated in discovery. (ECF No. 122, at 3-4). Ms. McCoy further stated that she had been admitted to the hospital for a "critical health issue" two days before her

deposition and was not released until two days after her deposition. (*Id.* at 4). Mr. Miles further stated that he requested to postpone his deposition three days before it was scheduled because he was diagnosed with COVID-19 and was experiencing symptoms from the virus. *Id.* In its reply, Transdev reiterated its request that Ms. McCoy and Mr. Miles be dismissed, or in the alternative, be sanctioned and made to pay all deposition costs to the extent the scheduling order was amended. (ECF No. 125, at 3). Transdev also asserted that the failure of Ms. McCoy and Mr. Miles to attend their depositions was part of a broader pattern, as other plaintiffs had needed to reschedule their depositions. (*Id.*).

These two plaintiffs have established that their failures to attend were not bad faith or in callous disregard for the authority of the district court, and if anything was due to inability. Both remained "ready and willing" to appear for deposition. (ECF No. 122, at 8). It remains unclear whether the depositions have since been taken. Certainly, less drastic sanctions would have been available—such as requiring Plaintiffs to pay some of the deposition costs. Transdev did not, however, seek that relief in its motion; merely suggesting it in the reply. (ECF No. 125, at 4). Transdev's motion to dismiss as to Ms. McCoy and Mr. Miles will be denied.

**Smith and Morrison**

The opt-in Plaintiffs, Ms. Smith and Mr. Morrison, however, failed to respond to Judge Copperthite's order to show cause, and have apparently abandoned the case.  They were warned that failure to respond to the show cause order could result in the dismissal of their case.  Their names were not included in the Amended Complaint (ECF No. 158), the court remarked that their status was unclear at that time (ECF Nos. 151, at 1, and 152), and would be clarified either by dismissal or addition to the amended complaint. Given their failure to respond, Transdev's motion as to Ms. Smith and Mr. Morrison will be granted.

**V.   Conclusion**

For the foregoing reasons, all of the motions will be granted in part and denied in part.  A separate order will be entered.


                                        /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge